MICHAEL GORMLEY, Ordinary, plaintiff in error, vs. JOSEPH H. TAYLOR, defendant in error.

1. When the Constitution creates an office to be filled by appointment of the Governor, by the advice and with the consent of the Senate, but legislation is necessary to carry the Constitution into effect, and an Act for that purpose is passed, which, by its express terms, does not take effect until a day subsequent to the adjournment of the Senate, the office is vacant, and may be filled by the Governor, until it is filled permanently, as provided by the Constitution. It is immaterial whether the office has "become vacant;" it is sufficient that a vacancy exists; since in the former case the Governor may fill it, under the express words of the Constitution, and in the latter case, he may fill it under section 66 of the Code, which authorizes him to appoint all officers and fill all vacancies, when no other mode is provided by the Constitution and laws.

Gormley *vs.* Taylor.

2. When important and almost revolutionary results must follow from declaring a session of the Legislature illegal, the Courts are bound to require a most palpable and direct violation of the Constitution, before they interfere. It is the duty of Courts, in passing on the constitutionality of laws, not to pronounce against them, except in a clear case, and to make every intendment possible in favor of their constitutionality.

3. Whether it is in the power of the Courts to hold a law unconstitutional, on the ground that the Legislature passing it is not in session according to the mode prescribed by the Constitution, and to inspect its journals to determine the fact—*Query?*

4. The Legislature having, by a vote of each house, declared that the session of 1870, was not a session after the second session under the Constitution of 1868, it is very doubtful whether this decision is not binding upon the Courts, as the judgment of a tribunal authorized by the Constitution to decide it.

5. Article III., section 1, paragraph 3, of the Constitution of 1868, which provides that "the first meeting of the General Assembly shall be within ninety days after the adjournment of this Convention, after which it shall meet annually, on the second Wednesday in January, or on such other day as the Legislature may direct," * * *, and that "no session of the General Assembly, after the second, under this Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof," may, in a very just and proper sense, be construed to mean by the words, "second session under this Constitution," second session as provided for and specially required by this Constitution, so as to exclude the "two sessions," called extra and irregular sessions, which, though legal, are not specially mentioned and required by the Constitution.

6. The session of the General Assembly, which met on the ... day of July, 1868, more than ninety days after the adjournment of the Convention, under the order of General Meade, and more than seventeen days before the Constitution of 1868, as decided by this Court in *Foster vs. Daniels*, 39th Georgia Reports, 39, went into operation, though a legal session may be called an extra or irregular session, and not one of the sessions meant by the Constitution in Article III. of the Constitution.

7. The session of the General Assembly of 1870, may, therefore, be fairly said not to have been a session after the second session, within the meaning of the clause which prescribes that no session, after the second under this Constitution, shall continue longer than forty days, unless prolonged, etc., etc.

8. The Act of October 28th, 1870, directing the Ordinaries of the several counties to assess a tax to pay the salaries of the District Judges and attorneys, is sufficiently definite, since, from the census of 1870, the

amount due from each county may be ascertained by simple calcula-
tion, and the tax books in the Comptroller General's office will fur-
nish the property to be taxed. WARNER, Judge, dissenting.

Constitutional Law. Tax. Before Judge HARRELL.
Randolph Superior Court. May Term, 1871.

This cause was submitted to the Court below upon the
following agreed statement of facts : An order was sued out
by Taylor against Gormley, as Ordinary of said county,
calling on him to show cause why he should not levy and
collect the taxes on the persons and property of the Eleventh
District of said State taxable by law, for the payment of the
salary of.Taylor, as District Attorney of said district. Tay-
lor was appointed to said office by the Governor of this State,
and commissioned on the 18th of January, 1871, in the re-
cess of the General Assembly. Gormley admitted that, by
the Act organizing the District Courts, it is his duty to levy
such tax and pay said salary, if Taylor be legally and con-
stitutionally appointed and holding said office. But Gorm-
ley says that, under the constitution and laws of Georgia,
Taylor is not legally and constitutionally appointed and
holding said office. It is admitted that Taylor's appoint-
ment was never ratified or confirmed by the Senate of Geor-
gia, and that there has been no session of said Senate since
18th of January, 1871.

The Court held that Taylor's appointment was constitu-
tional, and ordered that the tax be raised and his salary
paid. This is assigned as error, upon the ground that the
office had not become vacant when said appointment was
made, and the Governor had no power to commission Taylor
until his appointment was ratified by the Senate.

H. FIELDER, for plaintiff in error. This is not an office
under the constitution, because it took an Act of the Legis-
lature to establish the Court. There is no apportionment of
the tax between the counties of the district, by law. The

Gormley *vs.* Taylor.

Act of the 28th of October, 1870, organizing these Courts, is void, because it was passed after the General Assembly at its third session had sat forty days, and no two-thirds vote prolonged the session : Constitution of 1868 ; Dwarris on Statutes, etc., 67–69 ; 4 Hill, 384 ; 1 Denio, 9 ; 2 *Ibid.*, 97 ; 22d Wend., 9. The office did not *become* vacant: Acts of 1870, page 77 ; Constitution of 1868 ; 2 Story on Con., sec. 1559 ; Paschal on Con., 182, 183 ; People *vs.* Forgerer, Brees., 68 ; 1 Cong. Elec. Cas., 874 ; 2 *Ibid.*, 613 ; 16 Am. L. R., 786 ; 8 Inter. Rev. Dec., 137 ; Schlash *vs.* Peavy, Circuit Court, Ark., April, 1869, pamph. 11 ; 2 Abbott's Dig., U. S. R., title Office.

J. H. TAYLOR; HOOD & KIDDOO, for defendant. This is a constitutional Court : Constitution 1868, Art. 5, sec. 4, pars. 1–7. Appointment : *Ibid.*, 39. Vacancy : *Ibid.*, Art. 4, sec. 2, par. 4. Prior superior Act controls later inferior Act : No. 78 Federalist, page 358 ; Constitution 1868, Art. 11, sec. 2. Salaries, how paid : Act of 28th October, 1870, secs. 2, 3, pages 77, 78. Tax, how levied : Constitution 1868, Art. 5, sec. 5, par. 2 ; Code, sec. 548. This was second session of General Assembly : Constitution 1868, Art. 3, sec. 2, par. 3. As to power of General Assembly over this Court : Constitution 1868, Art. 5, sec. 16, par. 1.

McCAY, Judge.

1. The Constitution, Article 5, section 4, declares that, until the Legislature otherwise provides, there shall be a District Attorney and a District Judge in each senatorial district. It defines their duties, fixes the jurisdiction of the Judge, and prescribes how both of these officers shall be appointed, and the qualifications of each of them. The want of certain necessary details, as to the *mode* of proceeding, and some provisions for raising the salaries, made it proper that no such officers should be actually appointed until legislative action was taken in the premises. This was not done until

the Act of 28th October, 1870. This Act, as well as the Constitution, provided that these officers should be appointed by the Governor, by the advice and with the consent of the Senate. The Act, however, in express terms provided that it should not go into effect until the 1st of January, 1871. No nominations were made and no action taken during the session of the Legislature. That body adjourned 25th of October, 1870.

Soon after the 1st of January, 1871, the Governor, considering these offices vacant, appointed incumbents to hold until the next meeting of the Legislature. Mr. Taylor, the defendant in error, was one of these appointees. Was this appointment, not being with the consent of the Senate, legal? Without doubt, the provision of the Constitution and of the Act of October 28th, 1870, for *filling* these *offices* for the full term, does not cover the case of vacancies. The Constitution, in express terms, provides, " that when *any* office becomes vacant, the Governor shall have power to fill it, unless otherwise provided by law : Article 4th, section 2, paragraph 4.

This applies to *all* officers of every kind, no matter how or by whom, the office is to be permanently filled. The incumbent is to hold until a successor is appointed, according to the regular method for filling the office : Article 4, section 2, paragraph 4.

If elected by the people, or by the Legislature, or appointed by the advice of the Senate, no matter how it is made the duty of the Governor to fill the vacancy, until it is filled, as provided, either by the Constitution or by the law. Nor does it matter *when* the vacancy happens. Whenever, or however it happens, it is the duty of the Governor to fill it, until it is filled in the mode and by the power provided for permanently filling it, unless the Constitution or the law points out some other mode.

As to officers elected by the people, the *law* has generally pointed out a mode for filling vacancies. Sometimes it is by

Gormley *vs.* Taylor.

an immediate election ; sometimes by appointment of the Ordinary ; sometimes by appointment of the Judge of the Superior Court; sometimes by appointment by the Governor. But as to all officers elected by the Legislature, or appointed by the Governor, with the advice of the Senate, no other mode is pointed out by either the Constitution or the law. So that, as to these offices, it is the duty of the Governor to fill every vacancy not, as is often said, until a successor *can be* appointed, agreeably to the Constitution, but until one *is* appointed agreeably thereto. Even if the Senate be in session when the vacancy happens, it may be that the Governor fails in his duty to nominate, or he and the Senate cannot agree; or, if the office be one filled by legislative election, they may fail to elect. The Constitution does not intend that there should fail to be an incumbent, since it provides, that *in all cases* where no other provision is made, if any office become vacant, the Governor shall fill the vacancy until the office *is* filled in the mode provided for filling it permanently.

Our Constitution is very different from the Constitution of the United States. That only gives the President power to fill vacancies which happen *during the recess of the Senate.* Our Constitution has no such limitation. It simply provides that, " when any office becomes vacant, by death, resignation or otherwise," the Governor shall have power to fill it until it is filled in the mode provided by law. But it is argued that the words here used cannot apply to this case. The words are " become vacant." It is said that this implies that the office has been filled, and has " become vacant."

It is very clear that in the case under discussion there was *in fact* a vacancy *existing.* There was an office ; the Constitution provides for that. All the details necessary for the full carrying into effect of the Constitution were provided by the Act of 28th of October, 1870. Nothing was wanting but men to fill the offices. If this was not a vacancy the word is wrongly defined by the law, books and lexicograph-

Gormley *vs.* Taylor.

ers.   Webster defines it: "The state of being destitute of an incumbent."   Bouvier: "A place which is empty."

It does seem to me that the distinction between "is vacant," and "become vacant," is a distinction without a difference.   Mr. Wirt, Mr. Legare and Mr. Taney, in their official opinions as Attorney-Generals, have all concurred in holding that, if a vacancy "exists" during a recess of the Senate, it may, in a very fair sense, be said to "happen" then, though in fact it occurred before the recess.   And this has been the uniform practice and holding of the Executive Department of the United States.   Mr. Wirt, in his opinion, insists that the words "may happen during the recess" are to be understood as "may happen to exist during the recess:" Opinions Attorneys-General, volume 1, page 631.   Mr. Roger B. Taney fully agrees with this construction: Opinions Attorneys-General, volume 2, page 525.   So, too, Mr. Legare: *Ibid.* volume 3, page 673.   But suppose we admit that an office never yet filled cannot be said "to become vacant;" what then?   The most that can be said is, that, though the office is "vacant," it has not "become vacant," and the *Constitution* has not provided in terms how it shall be filled. The Constitution provides for filling offices permanently and for filling offices which have "become vacant."   Vacancies which are not cases when the office has "become" vacant are not *provided* for by the Constitution.

Are such offices to remain vacant until the Senate meets, or the Legislature elect, or the people choose?   I think not. The law—the Code, section 66—provides that the Governor shall fill *all* vacancies, unless otherwise prescribed by the Constitution and the laws.

I conclude, therefore, that the most reasonable construction of the Constitution clothes the Governor with power to fill this vacancy, and that, even if this be an office which, though vacant, did not "become" vacant, the power is still in the Governor; since if it be a *casus omissus* in the Constitution, it is provided for by section 66 of the Code, which

Gormley *vs.* Taylor.

authorizes the Governor to fill all vacancies not otherwise provided for. It may not be amiss to say that this is not a new question in Georgia. The Pataula Circuit was created by the Legislature on the 8th of February, 1856. By the laws, as they then stood, the election for Judge was by the people, and did not take place until April, 1857. Governor H. V. Johnson appointed Judge Kiddoo to fill the *vacancy* until the election.

At the same time and under the same circumstances the Governor appointed a Solicitor-General for the Circuit. So, too, when the Talapoosa Circuit was created, February 29th, 1856, the election for Judge and Solicitor-General was provided for to be held in October, 1857, and the Governor, under *his power* to *fill vacancies,* appointed Judge Hammond, Judge, and Mr. H. Fielder, Solicitor-General. So, too, when the Brunswick Circuit was created, the Constitution provided that the Judge and Solicitor should be elected by the people. The Act creating the Circuit authorized the Governor to appoint a Judge until the election. The Governor appointed the Judge accordingly ; but he also at the same time, under his general power *to fill vacancies,* appointed a Solicitor-General.

In 1838, the Legislature created the office of Commissioners of Banking, providing that they should be elected by joint ballot by the Legislature. Mr. Iverson L. Harris was elected one of the Commissioners, but declined to serve, and no other election was had. After the adjournment Governor Gilmer appointed Mr. White to fill the *vacancy.* The Legislature, at its session of 1858, *created* the office of commissioners to revise the Code, providing three commissioners to be elected by the Legislature. Before the adjournment, I. L. Harris, David Irwin and Herschel V. Johnson were elected. Messrs. Harris and Johnson declined to serve, and Governor Brown, after the adjournment, appointed Messrs. T. R. R. Cobb and R. H. Clark. There are, doubtless, other instances, but these are sufficient to show what has been un-

derstood to be the meaning of the word "vacancy," to wit : An office without an officer, and that in such cases it is within the powers of the executive to fill it. These cases prove, too, that, to make such a vacancy, it is not necessary that the office should have been once filled in the regular mode before such a vacancy as the Governor can fill, may occur.

For these reasons I am satisfied that, under the Constitution and laws of this State, it was within the power of the Governor to make the appointment of Mr. Taylor, and having done so, his right to receive his salary, under the law, is undoubted.

2. It is contended by the plaintiff in error that, admitting the appointment to be properly made under the Constitution and laws, Mr. Taylor is not entitled to his salary, however the Act of the General Assembly to carry into effect the constitutional provisions as to the district Court, was passed and approved, as appears by the journals and the signature of the Governor on the 28th of October, 1870; that this was more than forty days after the commencement of the session, and that, as the session of 1870 was the third session under the Constitution of 1868, any Act passed by the Legislature more than forty days after the commencement of the session, is unconstitutional and void ; since it does not appear by the journals of the two houses that any two-thirds vote was had prolonging the session.

It is true, in fact, that, under the orders of General Mead, the then military commander of Georgia, under the Act of Congress of March 2d, 1867, there was a session of the Legislature, commencing on the 4th of July, 1868. It is also true that there was a session, as the Constitution provides, commencing on the second Wednesday in January, 1869.

It is difficult to say when the session of 1870 commenced. The body met on the 10th of January, 1870, under a call of the Governor, two days before the second Wednesday, as

Gormley *vs.* Taylor.

required by the Constitution. It proceeded to reorganize as a new body, and its organization was reported complete on the 30th of January, 1870. On the 14th of February it adopted the amendments to the Constitution of the United States, as *required* by Act of Congress of December, 1869. It then took a recess until the 14th February, then met again, and elected Senators, passed various resolutions, and took a recess until the 18th of April. It had, at this recess, been in session thirty-nine days. It met again the 18th of April, continued in session, doing nothing until the 4th of May, when it took a recess until the 6th of July. It then met, but did nothing until the 18th of July, when it proceeded to business formally, Congress having at length declared the State to have fully complied with the Reconstruction Acts.

If the session of 1870 commenced, by law, on the second Wednesday in January, (the 12th of that month,) forty days expired on the 21st of February, 1870. If only the days actually consumed, not counting recesses, are to be considered, the forty days expired on the 19th or 20th of April. If the session is to be considered not to have commenced until the 18th of July, when it proceeded regularly to business, then the forty days expired on the 28th of August, 1870. In any event, not only the Act referred to, but almost all of the other Acts passed at the session of 1870, were passed after the forty days had expired. After the 28th of August the Legislature passed many Acts of the most important character—Acts which have been solemnly acted upon by the people and by the Courts, and if these Acts are void, consequences almost revolutionary in their character must inevitably result. It may be that this Court must do its duty, no matter what may be the consequences. But it is also true that it is the solemn duty, not only of this but of every Court, when called upon to determine any question, and especially when called upon to declare an Act of the General Assembly void, to look to the consequences, and if

they be of almost a revolutionary character, to be very clearly satisfied, before producing such startling and revolutionary results. After forty days had expired the session of 1870 changed the time for the meeting of the Superior Courts in twenty-five counties of the State. It changed the time for the meeting of the Supreme Court from the first Mondays in June and December to the second Monday in January and the first Monday in July. It directed a revision of the jury boxes all over the State. It created three new Judicial Circuits, and created four or five new counties. It authorized bills of exceptions to be brought to the Supreme Court on the granting or refusal to grant injunctions, and changed the mode of proceeding in the Supreme Court in many particulars. It altered the day fixed by the Constitution for electing members of Congress, members of the Legislature, and county officers. It altered the day fixed by the Constitution for the meeting of the General Assembly. These Acts have all been treated by the Courts and by the people as of force for nearly a year. The Superior Courts have met under these Acts; the jury boxes have been revised under them; the new circuits and the new counties have gone into practical operation, and for nearly a year have been proceeding as legal bodies under these Acts. This Court has held one full session, and is far advanced on another, in obedience to these Acts, and has constantly recognized and acted upon the Acts of the session of 1870, after the forty days, as legal Acts. The people, in obedience to one of these Acts, allowed the election day fixed by the Constitution, to-wit: the Tuesday after the first Monday in November, 1870, to pass, and no election was held to fill these important offices until the 20th of December, 1870. So, too, the day fixed by the Constitution (to-wit: the second Wednesday in January) for the meeting of the Legislature in 1871, has, in obedience to one of these Acts, been allowed, by the members elect, to pass, with the understanding that the proper day for the meeting is in

Gormley *vs.* Taylor.

November, 1871, as provided by the session of 1870, by an Act approved October 28th, 1870, after forty days had expired.

If the law under which Mr. Taylor was appointed is void, because passed after forty days, then the sessions of the Superior Courts, changed by the said session, have been illegally held ; the last session of this Court was illegal, this session is illegal; and we (holding an illegal session) are called upon to determine the session of the Legislature, when these Acts were passed, illegal. The Clerks, Sheriffs, Tax Collectors, and other county officers, now in office, are all illegally in office. The jury boxes have been illegally revised, the Legislature elect is illegally elected, and the old Clerks, sheriffs and county officers are still the legal officers. Nay, more, the old Legislature, elected in 1868, is still the legal Legislature ; since the Constitution, in express terms, Article 3, section 1, paragraph 2, provides that the members of both Houses, though elected for two years, shall continue to hold until their successors are elected and qualified; a conclusion so extraordinary, and involving results so momentous, a conclusion resulting in the illegality of the sessions of the Superior Courts and of this Court, and in the illegality of the elections of all the Clerks, sheriffs, county officers, members of the Legislature, and members of Congress, and in the loss of any session of the Legislature for 1871, should only be the result of the clearest convictions, and be unaccompanied by any, even the most trifling, doubt of its correctness. Every intendment should be made that is at all compatible with sound reason or fair construction. We have been at sea long enough. Even one day of an illegal government is an evil that it may take years to see the consequence of, but from a whole year of illegal Courts, and a whole session of an illegal Legislature, who can calculate the evils that must ensue ?

If it be possible to prevent this by any fair and just construction ; if this Court is not *driven* by the clear and incon-

testible rules prescribed for its action so to determine, it is its solemn duty to the public and to the law to sustain, and not to overturn, the Acts thus assailed.

3. For myself, I have great doubts as to the power of the Courts, under the Constitution, to pass upon the legality of a session of the Legislature. We are bound, it is true, to declare laws not in conformity to the Constitution void. But there is a plain distinction between an Act of the Legislature and a session of the Legislature. It seems to me a very dangerous thing, and one not contemplated by the Constitution, for one of the branches of the government to set in judgment upon *the legality* of another. The Constitution expressly clothes each House with the power to judge of the qualifications of the members, and if they may do this as to each member, it would seem to follow that they may do it of the whole combined. Is this Court to step in to scan its daily proceedings, watch its journals, and set, as a censor, upon its doings? We are compelled to say, whether any separate Act, passed by it, conforms to the Constitution, but whether the body itself is in session at the proper time, seems to me to be left to the conscience and judgment of the body itself. And this, I think, is the tenor of the authorities.

4. But I do not rest my judgment upon this view of the matter alone. It is a fact, as appears by the journals, that the Legislature, by a vote taken in each House, determined that the session of 1870 was not a session after the second, under the Constitution. The Senate declared, that the session of 1870 was the first session: Senate Journal, page ...... The House declared simply that it was not a session after the second: House Journal, page ...... We have thus the solemn judgment of each branch of the General Assembly, that, under the circumstances, no vote of two-thirds was necessary to authorize the session of 1870 to continue longer than forty days. Was not this a matter proper for the judgment of the Legislature, and having been deliberately made, is not the judiciary bound by it?

Gormley *vs.* Taylor.

5. Nor is it all clear to my mind that this judgment was not right, or that the session of 1870 was one which was required to be prolonged by a two-thirds vote, in order to continue in session longer than forty days. The clause of the Constitution is as follows: Article 3, section 1, paragraph 3: "The *first* meeting of the General Assembly shall be *within* ninety days after the adjournment of this Convention, after which it shall meet annually on the second Monday in January, or on such other day as the General Assembly shall prescribe." "No session of the General Assembly after the second, under this Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof."

The Convention adjourned on the 12th of March, 1868. Ninety days after this would be the 10th of June, 1868. No session of the General Assembly was held until the 4th of July, 1868, so that the first regular appointed session under the Constitution was not held at all. The session which met July 4th, 1868, was not provdied for by the Constitution, but was *called* under the orders of the military commander, and met at his behest. That session did not meet by virtue of the Constitution.

6. Indeed, this Court decided in *Foster vs. Daniels,* 39 Georgia, 39, that the Constitution did not go into effect until the 21st of July, 1868, and that the County Court, which the Constitution *in terms abolishes,* was a lawful Court on the 20th of July, 1868, but unlawful on the 22d of the same month. Can that be fairly said to be a session according to and by virtue of the Constitution which met seventeen days before the Constitution became the law of the land? The truth is that a state of things occurred for which the Constitution made no provision, it was a state of things not contemplated by the Convention. It supposed Congress would immediately ratify the Constitution, and it expressly provided that the first session should be *within* ninety days after the adjournment. Congress did not ratify the Constitution

within ninety days, and the first session, as provided for, was not held at all.

7. As I have said, the session of July, 1870, was a called session, not a regular one, according to the directions of the Constitution, and it met seventeen days before the Constitution had any existence, as a rule for the government of the day of meeting. Indeed, the Constitution, as it now stands, did not exist at all until the 21st of July, 1868, since upon that day the Constitution was so altered as to comply with the requirements of the Act of Congress of June 1st, 1868. After that day the Constitution was of force, and the General Assembly controlled by it. But it is very clear that the *meeting* of the session of 1868 was not only not provided for or pointed out by the Constitution, but the *meeting* was by virtue of the order of the military Commander, who then exercised supreme power in the State.

I do not say that the session of 1870 was illegal, or that its laws and actions are not to be considered as passed under the Constitution, though that is a view taken by many. The idea I intend to convey is, that though a legal session, it was not a regular, but a *called session,* and was not one of the two sessions which, by the Constitution, might hold more than forty days without a two-thirds vote of prolongation. The language of the Constitution is peculiar. It first provides for a session within ninety days after the 12th of March, 1868, and this it calls the "first session." It then provides that after this the meetings shall be on the first Wednesday in January of each year, until otherwise provided by law. Then, in the same Article, section and paragraph, come the words now under discussion, to-wit: "no session of the General Assembly, after the second under this Constitution, shall continue longer," etc. What is the obvious meaning of this, taking the whole paragraph together? It can hardly be supposed that the Convention contemplated a meeting of the Legislature which should not, in its deliberations, be controlled by, and be in this sense under the Constitution.

*Something* must have been meant by the words, "under this Constitution" other than this. In that sense, the words are surplusage, since in no event, then conceivable, could it be imagined there would be a session of the Legislature "not to be controlled by the Constitution." The reason for using this language is plain; the Constitution had provided for a first session, to-wit: within ninety days. It had provided for other regular annual sessions, to-wit: on the 2d Wednesday in January in each year, or such other day as the General Assembly may prescribe. It then adds: "No session of the General Assembly, after the second under this Constitution shall," etc.; that is after the second, as pointed out and directed, and provided for by this Constitution. The object was to exclude from the two sessions contemplated any called, extra or irregular session, and to declare that the two sessions meant, were two sessions held at the times provided for by the Constitution.

Such is the natural grammatical construction of the words. The words "under this Constitution" qualify the word "session," and not the words "General Assembly," and mean "session," as provided for, fixed by this Constitution. And the object was, as we have said, to exclude from the two sessions any called, extra or other sessions which, though lawful, were not nominated and pointed out specifically in the Constitution. Such a construction is, at any rate, a fair one, and, even if it be doubtful, it is sufficiently fair and plain, under the well established rules controlling the judiciary in their judgment of constitutional questions, to make it proper for us to adopt it. It is the settled rule that, in cases of doubt, the Courts will alway decline to declare a law unconstitutional. Respect for a co-ordinate branch of the government, and, in this case especially, the almost total revolution which the holding a whole session of the Legislature illegal, would produce, not only justifies, but imperatively demands, a very clear case. We do not think this is such a case. On the contrary, the strength of the argument is in favor of the legality of the session after forty days.

8. We think the Act of October 28th, 1870, is sufficiently definite. It fixes the salary according to the population of the district. That is easily ascertained. The Constitution recognizes the United States census as an official mode of ascertaining the population of a district, since it clearly contemplates that the representation of the counties in the lower House shall be based upon it. Constitution 1868, Article ......

That census was taken in 1870, and can be easily procured. The tax is, by this Act, to be raised upon the taxable property of each county proportionably. That can be officially ascertained at the office of the Comptroller-General.

Under the rule that " that is certain which might be made certain," we think this sufficient *data* upon which to ascertain and assess the salary and the share due from each county.

LOCHRANE, Chief Justice, concurring.

The question raised by the record in this case, is not merely the constitutionality of a legislative Act, but the constitutional competency of the Legislature to pass any Act. The Constitution of 1868, provided that the first meeting of the General Assembly should be within ninety days after the adjournment of the Convention framing the Constitution. The first Legislature did not meet at that time. It was called together under the Reconstruction Laws of Congress, and was qualified by a Judge of the United States Court, with a Provisional Governor, and was itself a Provisional Legislature. The convocation, organization, and qualification was alien to the Constitution, neither under it, nor within its provisions.

The last session was alike a called session, invoked by Act of Congress, under military supervision and qualification, with a Provisional Governor, and could not perform the first act of a Legislature under the Constitution of 1868, to-wit:

Gormley *vs.* Taylor.

pass upon the qualification of its own members; but a military commission performed this function.

The Legislature, in considering their status when in session in 1870, were not limited to the Constitution of 1868, but were properly to consider the Acts and action of Congress, and when the Executive Branch, by message of July 2d, 1870, held that session to be the first under the Constitution, and the General Assembly held it, in one branch concurring with the Executive, and in the other that it was not the *third*, such decision upon a question of political government, growing out of the surrounding legislation of Congress, does not invoke judicial interference, by the abstract application of mere constitutional limitations.

The Supreme Court is a Court for the correction of legal errors, and questions arising out of the formation of the State government and its relation to the Federal Union, or questions determined by the Legislature, as to whether its sessions, convened by military authority, under a Provisional Governor, were under the Constitution or under Acts of Congress, are not properly such legal errors, if errors, as invoke the judicial interference of a co-ordinate branch of the government.    Under the changes of Reconstruction, by Amendatory and Supplemental Acts of Congress, Georgia presented so many political phases, and such multiform legislation, that the intention of the original Act under which the Constitution was framed, became lost in the maze of complications, and the Act of 1867 was not carried out in its covenants, but new and unknown powers were called into requisition.    Courts cannot, by any rule of constitutional law, measure the rights of the one, or define the limitations of the other; and inasmuch as the political departments have solved the status of the State, and such decision violates no fundamental right, such decision should be respected by the other co-ordinate branch, or State judiciary.    And for these reasons I concur in the judgment of the Court.

The Constitution of this State declares, " no session of the

General Assembly, after the second under this Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof." Code, section 5122.

Among the fundamental articles to the Constitution it is declared, " Legislative Acts in violation of this Constitution, or the Constitution of the United States, are void, and the judiciary shall so declare them." Code, section 5107.

Section 5143 is in these words : " When the Constitution requires a vote of two-thirds of either or both Houses for the passing of an Act or resolution, the yeas and nays on the passage thereof shall be entered on the Journal.

Under these constitutional provisions, it is contended :

1. That there were three sessions of the General Assembly since the adoption of the Constitution of 1868.

2. That the last session was the third, and that it sat over forty days, and the Journal fails to show that its term was extended by a vote of two-thirds.

3. That, inasmuch as the *Act* was passed organizing the District Courts after the term of forty days, it is *void*, being in violation of the Constitution, and that it is the duty of this Court so to declare it.

The question raised by this record is one of the highest and most vital importance ; it is not, as will be seen by a glance, the constitutionality of an *Act* of the Legislature we are called on to decide, but the constitutionality of the Legislature itself, its constitutional competency to pass any Act, We are not invoked merely to construe the terms of legislation, but the power of the Legislature to legislate; and this turns upon the question whether the *last* session of that body was or was not the third, or one " after the second under the Constitution." In approaching the adjudication of this subject, I have grave doubt as to the right of the Judiciary to pass upon it, for reasons I will hereafter give. But with a view to meeting the question first upon its merits, and treating it as a judicial question, we may safely

Gormley *vs.* Taylor.

assert the proposition laid down embraces others essential to its demonstration. Under the Constitution, section 5122, Code, it is provided that the first meeting of the General Assembly shall be within ninety days after the adjournment of the Convention, after which it shall meet annually on the second Wednesday in January, or on such other day *as the General Assembly may prescribe."* Now to constitute a session under the Constitution it will not be doubted, but it must *meet* at the time prescribed by the Constitution, or at a time prescribed by the General Assembly. The first session did not so meet. History informs us, from the Journals of the House, that it was called together on the......day of...... by military order, and the Governor was provisional Governor only. And the very first constituent power of the General Assembly, to-wit, (Code, section 5135,) " Each House shall be the judge of the election returns and qualification of its members," was denied to it. That session was called together, and when convened its members were qualified by the Hon. John Erskine, Judge of the District Court of the United States. Attempting to act under the Constitution as to the provision just quoted, *to-wit : adjudging the qualification of its members,* and turning out some on the ground of disqualification, its own existence was afterwards, by Congress, declared to be illegal, its action ignored, and its organization perfected by laws of the United States, and not by the Constitution of 1868. The decision of the question involves the constitutionality of the laws of Congress ; for it is clear that if the Legislature was subordinate to a military dictation, it cannot be held to be under a constitutional limitation ; for at best it only existed by *permission.* It is useless to stand upon theories if facts are antagonistic to them. When Congress undertook to reconstruct the State, it began the work by a declaration that there was no civil government in Georgia ; the language used was : " Whereas no legal State governments," etc., " now exist in the rebel States," etc.

Gormley *vs.* Taylor.

The sixth section declares, "That until the people of the said rebel States shall, by law, be admitted to representation to the Congress of the United States, the civil governments that exist therein shall be deemed provisional only, and shall be, in all repects, subject to the paramount authority of the United States, at any time to abolish, modify, control and supersede the same," etc., etc. Under this declaration, Governor Jenkins was superseded by military authority enforcing such Acts, and a gentleman, in commission as a United States officer of the army, was detailed Governor of the State. He entered upon the discharge of his duties, and the whole civil administration went into his hands. The election of members of the Convention and their meeting at Atlanta, and framing this Constitution, are facts well known ; the enfranchisement of a new element into the body politic, and their exercise of suffrage, under Congressional legislation, facts that have become patent. The ensuing election, ending with the declaration of the ratification of the Constitution, and the returns of members, was followed by the *order* calling them together. When they met, in pursuance to the military chieftainship in Georgia, was it a meeting of the Legislature under the Constitution? The Constitution did not provide for such measures, nor did it define the duty of a Provisional Governor. We may struggle in vain. to find any recognition of the officers who called them together, or the definition of their duties. This Court, in 39th Georgia, 40, held that the new Constitution went into effect on the 21st of July, and yet the body met on the 4th. If the Constitution did not take effect until the 21st, as decided by this Court, Judge Warner delivering the opinion, then it did not *meet* under the Constitution, and therefore it must have *met* under something else. And if it met under something else, it was not the first meeting of the Legislature under the Constitution. If it met under the Reconstruction Acts of Congress, called together by virtue of the power conferred by those Acts on Major General Meade, then it cannot be

Gormley *vs.* Taylor.

held it met under the Constitution, except the one embraced the other, and this can only be conceived by ignoring the source of the Constitution, to-wit: the people of Georgia, and give its paternity to Congress.

Again, if the *Constitution* existed by permission of the military power—in other words, if the authorities then governing Georgia allowed its recognition, by permission, it was not the Constitution that was the rule, but the power behind it. Until it stood upon the will and sovereignty of the people of the State, and had an existence beyond the permission of any power, an existence inherent and unquestionable, it could not, with proper regard for the use of language, be called the *Constitution* of Georgia, in that broad political sense, which comprehends the dignity and sovereignty of the people. It was a written parchment, subject to a will incompatible with the constitutional will of a free people. And to talk of a General Assembly under a Constitution, whose rights to do the first constitutional act of a constitutional Legislature, to-wit: pass upon the election returns and qualifications of its own members is denied, is the assertion of a sentiment, not the embodiment of a fact. What became of the Constitution and its guarantees, when Congress returned to seats in its General Assembly, some thirty members, and dispersed as many to their homes?

Thus we say, upon the merits of the question, we do not think when the Legislature decided that the last session was not the third, and overruled the ruling of the Speaker upon that subject, that it was a question of violation of the Constitution; for in the phases of reconstruction in Georgia, the status of the State was a difficult one to solve, and not without grave doubt in the premises; the incubation was long and the travail protracted, and the decision of the Legislature on the subject, one at least, sustained by the legal development of events.

But is it a question for the Judiciary. No evil could be more offensively aggressive on the rights of the people, than

the assumption by the Judiciary of powers not delegated to their rightful jurisdiction. To lodge, in the opinions of a few men, no matter how far removed from the passions of the hour, the rights of the people in the creation of government and decision of affairs of State, was not the intention of the people. Constitutions and laws precede the Judiciary, and we decide questions arising out of them after they are made, not before. We restrain the Legislature within the limitations set to its powers. But we may not set up our opinions as to the decision of the Legislature upon questions not purely legal. The Constitution prescribes the manner of passing laws, and the Legislature must pursue the mode prescribed. The Constitution divides powers, and the co-ordinate branches must stay within the prescribed limits. If this were not so, the Judiciary might declare an Act void, and the Legislature might impeach the Judiciary, as happened in Illinois, for the decision. The intention of the Constitution is to divide the powers, and let each move independently in its orbit, all revolving round the Constitusion in their appropriate sphere, like the planetary systems round the sun, and each kept in place by the central power which moves the whole in harmony.

The jurisdiction of the Judiciary is to check and balance the acts of the Legislature, to bring them within the Constitution, and hold the scales evenly in the administration of the laws enacted. But in this case, we are called on to reverse the judgment of the Legislature on the condition growing out of the reconstruction of the State. The Legislature decided its last session not to be third in the House, and in the Senate, under the Constitution of 1868, and this judgment we are called upon to say was wrong.

Now, before going further, let us glance at the consequences of this decision. I am not unaware that ordinarily Courts have nothing to do with questions of public policy, or the entailment of consequences. No man better understands the necessity of lifting the Judiciary above the popu-

Gormley *vs.* Taylor.

lar prejudices or sympathies than myself. But while in the language of Lord Mansfield, " We have nothing to do with consequences; if certain rebellions were the result, we cannot prevaricate with our consciences or our God; all we have to say is, *fiat justitia ruat cœlum;*" yet with all judges, consequences must needs influence consideration. We should pause upon the enunciation of legal judgments whose effect would be to upset society, and turn loose chaos over the land. If the law is clear, we have nothing to do but annouce it. The consequences are not at our doors, and if this decision should declare void the last election for members of the General Assembly, passed after the forty days, and should bring to new life the *old*; whose commissions may extend until their successors are duly elected and qualified, and if this may postpone the election, under the Constitution, still, if such were to be the result, and the law is plain, it is our duty, and it would be my pleasure to discharge it. But to do so, I think consequences have something to do with invoking a more thorough consideration of all the questions arising under the facts of the case, before announcing it to be the law, and by that examination, I find involved in this decision of the Court a reversal of the judgment of the Legislature as to the *status* of the State under reconstruction. This embraces a political, as well as legal question, and it would be an ostentatious parade of learning to go through the decisions of Courts, excluding political questions involving the principles of government from judicial jurisdiction. The very question, made by Governor Jenkins before the Supreme Court at Washington, on the constitutionality of the Reconstruction Acts, admonishes me of the fact that these matters were, while regarded by the profession of Georgia plainly and palpably unconstitutional at the time, nevertheless *political* in their character, and *refused* a hearing at the bar of that tribunal. Our Court, by its organization, is a Court of errors, and the original jurisdiction over this question of what session, under the Constitution, the last was, must be

somewhere else lodged.    This case comes from the Superior Court, and that tribunal, by the Constitution (Code, section .5173,) is vested with jurisdiction over all civil and criminal cases, etc.    But no where can it be inferred by any legitimate line of argument, that the jurisdiction over an adjournment of the Legislature, has been conceded or granted to it. The power in all Courts to declare unconstitutional Acts void is not longer a matter of judicial controversy, but the power to review an Act of the Legislature, involving a political question—not a law—but a judgment pronounced by itself, upon its own competency to make a law, is not an apellate jurisdiction, nor is it an original jurisdiction.    If it exists, it exists in the powers of the Court under the Constitution, and the power to declare Acts in violation of the Constitution void, and this is expressed to be in regard to *legislative acts*.

In the case of *Foster Administrator vs. Daniel,* 39 Georgia, 40, this Court held that the State of Georgia, on the 21st July, 1868, had *fully complied* with the terms of the Reconstruction Acts of Congress, and that the Constitution went into effect upon the 21st July, 1868.    But although so decided by the Court, as applicable to the then case before it, it is true that the Reconstruction Acts provided that " until the people of said rebellious States shall be by law admitted to representation in Congress, any civil government which may exist therein shall be deemed provisional only," and we need not go through the mass of military orders interpreting and enforcing these Acts subsequent to the time stated.    The purpose is not to go farther than show the doubt which still hung over the *status* of this State; for if the Congress of the United States, by enactment recognized a different view of our condition, Congress had the *power,* under the Constitution of the United States, to control the question, and we need not deny *the right* without going farther and adjudging the *Acts themselves,* which is not essential or proper in this inquiry. If we establish the fact that subsequent to this decision Con-

Gormley *vs.* Taylor.

gress again legislated upon the subject, and in effect declared the *General Assembly* illegally organized, and by military commission, passed upon the qualifications of its members, then the *practical operation* of the Constitution of 1868, if existing on the 21st July, 1868, was amended by such subsequent Congressional interference, and the conditions imposed by Congress were paramount to the Constitution of 1868, and right or wrong, were of force and exacted obedience. When the Legislature deemed it necessary to go through the ceremony of adopting the Constitutional amendments over again, it was a political question, of which they were properly the judges; the question was not judicial, and is consistent with the view entertained by that body afterwards, relating to the term of session under the Constitution, they were then holding.

From these various sources I gather the intent of the Legislature to concur with the opinion of Congress upon the subject, with the orders of Generals Grant and Rawlins, Pope, Meade and Terry, and their constructions thereon, and the opinion of the Attorney-General; and looking to this intent with a view to arrive at a judicial conclusion, I hold that the subject of what *term*, under the Constitution, the Legislature then was holding, was one to be construed, not only by the Constitution of 1868, but by the Acts of Congress covering the Reconstruction measures. And inasmuch as this department of the government decided the question in the light of all the surrounding legislation and powers, I think such decision was political in its character, and that the Court cannot justly interfere by its judgment to set it aside, and declare all its *laws* to be, on that ground, *unconstitutional.* In this connection we may add that the Executive of this State took the position in his message to the Legislature, July 2d, 1870, that " the present legislative organization, if accepted and ratified by Congress, is the first and only legal organization *de jure* of this Legislature and of

the State Government established by the votes of the people under the Reconstruction Acts."

These two branches of the government of this State—the Executive and Legislative—have treated this question as a political one, of which Congress was the judge. And Congress having by its legislation given the fullest concurrence in this view, I am indisposed to enter upon the subject as a judicial one, inasmuch as now these questions would involve others of significant importance in the adjudication. It will, for instance, not be doubted or denied but the first Legislature was called together by virtue of a military order under the Reconstruction Acts; equally true and undeniable is it that it was sworn by an officer of the Federal Judiciary. Equally true that it convened as a provisional Legislature under a provisional Governor. Equally true that it did not meet at the time fixed by the Constitution. Equally true that its action was permissive by the military powers. Equally true that Congress treated it as a provisional body, amenable to Congressional dictation and interference. Equally true that the session under adjudication was convened by an Act of Congress. Equally true the last session was inaugurated by military commission, sitting upon the qualification of its members. And after a full review of the anomalous condition of the State Government during the years elapsing since the war, I cannot hold that this question is one for the Judiciary to interfere with. And I therefore concur in the judgment pronounced by the Court. As to the questions raised by the record, I have no doubt, holding the Act constitutional as to the appointments made under the provisions of the Code, and now only express my concurrence in the judgment pronounced.

WARNER, Judge, dissenting.

This was an application to the Judge of the Superior Court for a *mandamus*, by Joseph H. Taylor, Esquire, as District Attorney for the Eleventh Senatorial District, against

Gormley *vs.* Taylor.

the Ordinary of Randolph county, calling on said Ordinary to show cause why he should not levy and collect a tax for the payment of the salary of said District Attorney, for the year 1871, as required by the Act of 1870, organizing the District Courts in this State. The Ordinary filed his answer, and showed for cause why he should not levy and collect the tax on the citizens of Randolph county, that the said Joseph H. Taylor was not legally and constitutionally appointed District Attorney, and was not, therefore, entitled to have said tax levied and collected for the payment of his salary as such District Attorney. On the hearing of the case, the Judge held and decided, that the petitioner was legally and constitutionally in said office of District Attorney, and ordered the *mandamus* to be made absolute against the Ordinary for the levy and collection of the tax as prayed for. Whereupon the Ordinary excepted.

It appears from the record, that the petitioner was appointed District Attorney on the 18th day of January, 1871, during the recess of the Senate, and that said appointment had not been submitted to and confirmed by the Senate. On the argument before this Court, two questions have been made. First, that if the Act of 1870, organizing the District Courts, is a legal and valid Act, yet, the appointment was not a legal and valid appointment under the Constitution, and the provisions of that Act. Second, that the Act of 1870, was passed more than forty days after the commencement of the third session of the General Assembly, and is, therefore, void, under the provisions of the Constitution of 1868, that body having no lawful power or authority to enact laws after the expiration of forty days, unless prolonged beyond that time, by a vote of *two-thirds* of each branch thereof, as provided by that Constitution.

I propose first, to consider the legality of the appoinment of the petitioner as District Attorney, under the Constitution and the Act of 1870, on the assumption that that Act is a valid, constitutional law. By the 4th section of the 5th Ar-

ticle of the Constitution of 1868, it is declared, " Until the
General Assembly shall otherwise direct, there shall be a
District Judge and a District Attorney, for each Senatorial
District in this State." The 9th section of the 5th Article
of the Constitution, declares that said District Judges and
Attorneys, " *shall be appointed by the Governor with the ad-
vice and consent of the Senate.*" These sections of the Con-
stitution, it will be observed, only declare that until the Gen-
eral Assembly shall otherwise direct, there shall be a Dis-
trict Judge and District Attorney, for each Senatorial Dis-
trict in the State, and expressly declare how and in what
manner they shall be appointed. But there is no provision
made in this section of the Constitution, for the creation and
*organization* of a District *Court*, in which these officers could
officiate and perform their respective official duties. To cre-
ate and organize the *District Court*, in conformity with the
provisions of the Constitution, was devolved on the General
Assembly; and until that body created such *a Court*, there
was no " District Court" in which the District Judges and
District Attorneys could perform their respective duties as
such officers. The 1st section of the 5th Article of the Con-
stitution declares, that " the *judicial powers of this State*, shall
be vested in a Supreme Court, Superior Courts, Courts of
Ordinary, Justices of the Peace, commissioned Notaries Pub-
lic, and such *other Courts* as have been or may be estab-
lished *by law.*" Thus it will be seen, that there was no
*judicial power* vested by the Constitution in the *District
Courts*, until they were established *by law;* and the Judges
and Attorneys thereof could not have exercised any *judicial*
functions, or performed any other acts appertaining thereto,
in *that Court*, until it was *so established.* On the 28th of
October, 1870, the General Assembly passed what purports,
on its face, to be an Act to *organize* " the District Court,"
and defines its jurisdiction. Up to this time, there was no
District *Court* created and organized in this State, either by
the Constitution or the laws thereof, in which any District

Gormley *vs*. Taylor.

Judge or District Attorney, had ever officiated as the officers of such a Court, or performed any official duty therein, as the officers of such a Court. Assuming that the creation and organization of the District Court by the General Assembly, on the 28th of October, 1870, was a legal and valid organization, how and in what manner did the General Assembly declare *that Court* should be created and organized? The 1st section of that Act declares, that there shall be organized in each Senatorial District, (except certain specified Districts,) *a Court*, to be styled "the District Court," the Judge of which shall be known as "District Judge;" for *said Court*, there shall be in each District a prosecuting officer, to be called "District Attorney." The 2d section of the Act providing for the *organization* of the District Court, expressly declares, that the District Judge and Attorney shall be appointed by the Governor, *with the advice and consent of the Senate*, and hold their offices for a period of *four years*. Thus it will be seen, that the *original organization* of the District *Court*, under the provisions of the Act, was to be done by the appointment of a District Judge and Attorney by the Governor, *with the advice and consent of the Senate, for a period of four years*. And the General Assembly having expressly declared *the manner* in which the officers should be appointed, in order to effect an organization of *the Court*, it is not reasonable to suppose that it was intended that *the Court* should be organized by the appointment of the officers thereof, in a *different* manner than that prescribed in the Act. To have appointed and commissioned District Judges and District Attorneys, without the creation and organization of a District Court, *by law*, in which those officers could have performed their appropriate functions and duties as such officers, and without any compensation having been provided for their services, would have been a *useless* and unprofitable ceremony, not contemplated by the Constitution.

But it is said, that when the District Court was created and organized, by the Act of 1870, the office of the District

Judge of the District *Court* and the office of District Attorney for *that Court* were *vacant*, and that the Governor had the power, under the second section of the fourth Article of the Constitution, and the sixty-sixth section of the Code, to fill such vacancy, *without the advice and consent of the Senate.* That section of the Constitution declares that " when any office shall *become* vacant by death, resignation or otherwise, the Governor shall have power to fill such vacancy, unless otherwise provided by law; and persons so appointed shall continue in office until a successor is appointed, agreeably to the mode pointed out by this Constitution, or by law, in pursuance thereof." The answer to this suggestion and the argument in support of it is, that the Constitution does not confer the power on the Governor to *assume* that an office in a Court, created and organized *by law* for the first time, and which never had any *prior existence* or prior incumbent to fill it, is a *vacant* office, according to the true intent and meaning thereof. But, on the contrary, the Constitution contemplates that the District *Court* shall be created *by law*, and, when so created *by law*, then it is made the duty of the Governor to complete its *organization* by the appointment of District Judges and Attorneys therefor, *with the advice and consent of the Senate,* in accordance with the provisions of *that law,* if consistent with the Constitution, and *not otherwise.* The Constitution does not declare that an office in a newly created Court *by law* which had no power, existence or prior incumbent in it, is a *vacant* office; and therefore the Governor could not appoint an officer for that *newly created Court* in any other manner than that prescribed by the Constitution and the law organizing it, (to-wit:) *with the advice and consent of the Senate.* The Constitution confers the power on the Governor to make appointments to fill vacancies in offices which have had a *prior* existence, and been filled by a *prior* incumbent, when such offices *become* vacant by the death of the incumbent, or by his resignation, or otherwise, without the advice and consent of the Senate, such

Gormley *vs.* Taylor.

appointment to continue only until the assembling of the Senate. The words of the Constitution are, "when any office *shall become vacant*," etc.; not where any office *is vacant* because it never had any legal existence or incumbent in it, as is claimed in this case. Before an office in the District *Court* could *become vacant*, in the sense those words are used in the Constitution, that Court must necessarily have had a prior legal existence : for if there was *no such Court* there could not be any *vacant office in it*. The Constitution most clearly contemplates that the officer *whose vacancy* the Governor is empowered to fill by appointment, as claimed, must have been one who was *originally appointed* to the office, in accordance with the requirements of the Constitution and laws of the State, and *subsequent* to such lawful appointment the office *becomes* vacant by the death or resignation of the incumbent, or other cause not specially enumerated, which makes the office *become* vacant on account of the indisposition or inability of the prior incumbent, to perform the duties of it. Neither the words nor spirit of the Constitution authorize the exercise of the power claimed for the Governor in behalf of the defendant in error in this case.

But there is another insurmountable difficulty in the way of the defendant in error. The Act of 1870, is an Act to *organize* " the District *Court*," and that Act expressly provides, that *that Court* shall be organized by the appointment of the District Judge and attorney, by the Governor, *with the advice and consent of the Senate*, and hold their offices for a period of *four years*. This Act contemplates an *original appointment* of the District Judges and attorneys of the District Court, for the term of *four years*. The appointment of the District Judges, and District Attorneys, by the Governor, *with the advice and consent of the Senate for four years*, is an indispensable requirement of the Act to perfect a *legal organization* of the " District Court," and, therefore, *that Court* has never been organized in accordance with the terms and requirements of that Act, inasmuch as the appointment of

Gormley *vs.* Taylor.

the officers of that Court have not been made in the manner prescribed by the Act, so as to make it a *legal organized Court* in conformity with the express requirements thereof; for it will not do to say that the Governor could *assume* that the " District Court " had been legally organized in any manner *different* from that prescribed by the Act of 1870, and then proceed to fill the offices of that Court, as *vacant offices*, under the 4th paragraph of the 2d section of the 4th Article of the Constitution, when, in fact, the District Court had not been *organized*, as required by the Act of 1870, and thus making it impossible that any office in that unorganized Court could *become vacant*, as contemplated by the Constitution.    Before any office in the "·District Court" could *become vacant*, so as to authorize the Governor to fill it under the Constitution, as claimed, *that Court* must have been legally organized by the appointment of the Judges and attorneys thereof, by the Governor, with *the advice and consent of the Senate, for a period of four years,* as expressly required by the Act of 1870.    Then, if either of said offices in said Court had thereafter *become vacant,* by the death, resignation, or otherwise, of either of the officers of said Court so appointed, as required by the Act organizing *the Court,* the Governor would have had the power of appointment, under the Constitution, to fill such vacancy until the meeting of the next General Assembly, but not otherwise.    The 66th section of the Code only authorizes the Governor to fill all vacancies as contemplated by the Constitution and laws of the State. The radical error of the argument in support of the legality of the appointment, made by the Governor, of the defendant in error, as District Attorney of the District Court, is the *unauthorized assumption* that the District Court was created and organized by the Constitution; whereas, there was *no judicial power* vested in that Court by the Constitution, until it was " established by law," as provided in the Act of 1870, as is most clearly demonstrated by reference to the 1st section of the 5th Article of the Constitution, before cited.

Gormley *vs.* Taylor.

Until the passage of the Act of 1870, such a Court as the " District Court " was not known to, or recognized by either the Constitution or laws of this State as a Court, in which any judicial powers whatever could have been vested or exercised by any officer pretending to officiate therein. The Constitution simply provided for the appointment of District Judges and attorneys, whenever a District Court should be created and organized by an Act of the General Assembly, and defined their jurisdiction, when so appointed, under the provisions of such Act.

The result of the investigation of the question, involved in this branch of the case, therefore, is that until the District Courts were created, and organized *by law*, or in the language of the Constitution, " established by law," there was no judicial power vested in *that Court* by the Constitution, to be administered, performed, or executed by the appointment of either District Judges or District Attorneys, for *that Court*. But when the District Court was established *by law* on the passage of the Act of 1870, then it became the duty of the Governor to appoint the officers of *that Court*, in the manner required by that Act, the same being consistent with the Constitution, not to fill a *vacancy*, because none existed in that *newly established Court*, but to have made an *original* appointment of Judges and attorneys for that newly established Court, for the term of *four years, with the advice and consent of the Senate*, as required by that Act, so as to have perfected the complete organization of the District *Court*, as contemplated by the Constitution, and as required by the Act of 1870, and not *otherwise*. Until the District Court had been *organized* by the appointment of the officers thereof, as required by the Act of 1870, there was no office in *that Court* which had *become vacant* in the sense and meaning of the Constitution, which would authorize the Governor to fill it as a *vacant office*. The appointment of the defendant in error as District Attorney of the District Court of the Eleventh Senatorial District, by the Governor, under the

statement of facts disclosed by the record, was not only without authority of law, but in express violation thereof, as prescribed by the Act of 1870.

The next question to be considered is whether the Act of 28th October, 1870, organizing the District Court, is a legal and valid law, according to the provisions of the Constitution of 1868. This is the first time this question has been presented to this Court for adjudication, and it has received that consideration which its importance demands. By the third Article of that Constitution the legislative power of the State is vested in a General Assembly, consisting of a Senate and House of Representatives. By the third paragraph of the first section of the third Article of that Constitution, it is declared that "No session of the General Assembly, after the second, under *this* Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof." By the thirty-second section of the first Article of that Constitution, it is declared that "Legislative Acts in violation of this Constitution are void, and the Judiciary *shall so declare them.*" The first inquiry to be made is, whether the Act purporting to be an Act of the General Assembly, passed on the 28th of October, 1870, organizing the District Court, was passed at a session of the General Assembly *after the second session thereof*, under the Constitution of 1868. The *first* session of the General Assembly under *that* Constitution, as appears from the published Journals thereof, commenced in July, 1868, and adjourned *sine die* on the 6th day of October, 1868. The second session of the General Assembly under that Constitution commenced on the 13th day of January, 1868, and adjourned *sine die* on the 18th day of March, 1869. The third session of the General Assembly under that Constitution, commenced on the 10th day of January, 1870, and was adjourned by the proclamation of the Governor on the 25th day of October, 1870. In *Foster vs. Daniels*, (39 Georgia Reports, 40,) this Court *unanimously* held and decided that the

Gormley *vs.* Taylor.

Constitution of 1868 took effect and went into practical operation in this State on the 21st day of July, 1868.  The sessions of the General Assembly of the State of Georgia held in 1868, 1869 and in 1870, were *necessarily* held under the Constitution of 1868, which the members thereof took an oath to support, and could not have been held under any *other Constitution,* as the General Assembly of the people of Georgia.  The Judges of this Court, whose offices were created by that Constitution, were appointed and confirmed by the Senate of the General Assembly at its session in 1868, under *this* Constitution ; for *that purpose,* at least, it has been recognized as a session of the General Assembly under *this* Constitution, and for *that purpose* it is presumed that the session of 1868 will continue to be recognized as a session of the General Assembly under *this* Constitution.   If the session of the General Assembly in 1868 was a session under *this* Constitution for *that purpose,* why was it not a session under *this* Constitution for all *other legitimate purposes,* and to be counted as such ?   The truth is, and such is the historical fact apparent on the face of the public records of the State, that the session of the General Assembly held in 1868 was the *first* session thereof held under the Constitution of 1868 ; that session of the General Assembly enacted laws under *this* Constitution for the government of the people of Georgia, imposed taxes on them under *this* Constitution, and passed an Act to lay off a homestead under *this* Constitution; shall they now be told that the session of 1868 was not a session of the General Assembly under *this* Constitution ?   The stubborn facts contradict the unauthorized assumption.  The session of the General Assembly, then, which met on the 10th day of January, 1870, was the *third* session thereof under the Constitution of 1868, and consequently was a session *after the second,* under that Constitution.   The second inquiry to be made is, whether the Act in question was passed after the expiration of forty days from the commencement of the third session of the General Assembly, and, if

so, whether that session was prolonged by a vote of *two-thirds* of each branch thereof, as required by that Constitution. By reference to the Journals of the General Assembly, as published, which this Court is bound to recognize under the provisions of the 3762d section of the Code, the third session of the General Assembly under the Constitution of 1868 was commenced on the 10th day of January, 1870. The Act in question is dated on the 28th day of October, 1870, more than forty days after the commencement of the *third* session of the General Assembly under the Constitution of 1868. After a careful examination of the Journals of the General Assembly, it nowhere appears therefrom that the time was prolonged by a *two-thirds vote.* Indeed, it was not contended on the argument that the session was prolonged by a *two-thirds vote,* as required by the third paragraph of the second section of the third Article of that Constitution. The Constitution of the State is the *organic* law thereof, which creates the several departments of the State government, and limits and defines the powers and duties of each department thereof, the Executive Department, the Legislative Department and the Judicial Department. The Legislative Department of the State government has no power or authority to enact laws or to perform other legislative acts for the government of the people in any *other manner* than that prescribed by the Constitution, and if it shall do so, such pretended laws or other acts are *not binding on the people,* but are void, and it is expressly made the duty of the Judicial Department of the government to so declare them in all cases, except as to the election returns and qualifications of the members of the General Assembly; each House thereof is made the *exclusive judge* of those questions, by the fourth section of the third Article of the Constitution. The limitation of the time of each session of the General Assembly, as prescribed in the Constitution, was a wise one, intended for the protection of the people against unnecessarily prolonged, expensive sessions of the General Assembly. "No session of

Gormley *vs.* Taylor.

the General Assembly, after the second, under this Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof," is the *mandatory* language of the Constitution. It necessarily follows, therefore, that all pretended laws purporting to have been passed by the General Assembly at its *third* session in 1870, after the expiration of forty days from the time of the commencement of that session are void, unless it is clearly shown that the session was prolonged for a longer period than forty days, by a vote of *two-thirds* of each branch thereof, which it was not pretended was done, and the Journals of the two Houses furnish no evidence of that fact. And the legal presumption is that no such vote was taken, inasmuch as each House is required, by the Constitution, to keep a Journal of *its proceedings,* and to have the yeas and nays recorded thereon, as to all questions requiring a two-thirds vote, and publish it immediately after adjournment. The *mandatory* language of the Constitution is clear and explicit, that "No session of the General Assembly, after the second, under this Constitution, shall continue longer than *forty days,* unless prolonged by a vote of two-thirds of each branch thereof;" and it is equally binding on Governors and governed, legislators and people, and the Judges of the Courts. This clause of the Constitution is and was intended to be as binding and obligatory on the Legislature, Executive and Judicial Departments of the State government as any other clause thereof, and cannot be *ignored* without a *palpable violation of it.*

It is said, if there is any *reasonable doubt* as the validity of a law under the provisions of the Constitution, it is the duty of the Courts to decide in favor of its validity. But what is a conscientious Judge to do when he has *no grounds* on which to base such a doubt? If I should declare that I *doubted* the fact of my own existence, or that two and two made four, the *sincerity* of that doubt might well be questioned. So, if I should declare that I *doubted* as to what are the clear words and meaning of the Constitution before

recited, or that it was the *third* session of the General Assembly under the Constitution of 1868, which pretended to enact the law in question, or that it was passed after the expiration of forty days without a two-thirds vote of both branches of the General Assembly to prolong the session, or that the State was legally reconstructed under that Constitution on the 21st day of July, 1868, as was unanimously decided by this Court, in *Foster vs. Daniels,* then the *sincerity* of all such doubts might also well be questioned, for the simple reason that there are *no grounds* on which to base such doubts. If I should express *doubts* as to the plain unambiguous words of the Constitution, or as to what was the true intent and meaning thereof, or as to the fact that the session of the General Assembly of 1868 was held under the Constitution of 1868, or whether the mandatory requirements of the Constitution had been complied with, so as to make the pretended Act of the General Assembly, now in question before the Court, a valid law in pursuance of that Constitution, such expressed doubts, on my part, in view of the plain facts of the case, however *plausible* the pretexts therefor might be, would be open to a *searching criticism* by the people of the State, whose fundamental law, intended for their protection, has been so *flagrantly* and *recklessly* disregarded in the pretended enactment of the Act of 1870, organizing the District Court. The question is not who *called* the General Assembly of the State of Georgia to hold its session in 1868, or who administered the oath to its members, but the question is, under what *organic law of the State* did the General Assembly thereof hold its sessions in 1868, 1869 and 1870. Did the General Assembly of 1868 hold its session under the Constitution of 1868, and if not, under *what Constitution* was that session held ? If the General Assembly of 1868 *did* hold its session under the State Constitution of 1868, then that was its *first* session under that Constitution. It is an indisputable fact, that the officers of the State, created by that Constitution, including the Judges of this Court, as

Gormley *vs.* Taylor.

well as the Judges of the Superior Courts, were appointed and confirmed by the Senate of the General Assembly at its session in 1868, under *this* Constitution.  It is also an indisputable fact that the people of Georgia have been taxed to pay the expenses of that session of the General Assembly under *this* Constitution.  The question recurs, was the session of the General Assembly in 1868 held under the Constitution of 1868?  In view of the plain incontrovertible historical facts, well known to our entire people, to *state* the proposition, is to *decide it.*

But it has been said that this is a *political* question of which the executive and legislative departments of the government are the judges, and not the judicial department.  That argument amounts simply to this : that, although the executive and legislative departments of the State government may *usurp* power and exercise authority not conferred on either of them by the Constitution, still, as *such usurpers*, they are the exclusive judges to determine the validity of *their own usurpations*, whenever the individual rights of the citizens of the State are injuriously effected thereby.  Such is *not the fundamental law of the people of Georgia.*  Their Constitution expressly declares that legislative acts in violation of their Constitution, or the Constitution of the United States, are void, and *the Judiciary* shall so declare them.  The Constitution of the people of Georgia does not contemplate that the executive and legislative departments of the government shall be the judges of *their own usurpations* in the pretended enactment of laws for their government, in *violation* of that Constitution.  This duty is expressly devolved on the *judicial* department of the State government; and whenever the officers of that department shall fail or neglect to perform their appropriate functions and sworn duties, in regard to *such usurpations*, the people of the State will have no legal protection for their persons or their property, as they may soon discover, to their *irreparable injury* and damage.  If the Constitution of the State is not to be observed and regarded in the

enactment of laws for the government of the people thereof, then there is no *practical* use or benefit resulting to them in having a Constitution, limiting and defining the powers and duties of their agents created by it. Vattel, that eminent civilian, has *truthfully* said, that "to attack the Constitution of the State, and to violate its laws, is a *capital crime against society,* and if those guilty of it are invested with authority, they add to this crime a *perfidious abuse of the power with which they are entrusted."* This Court, in *Solomon vs. Commissioners of Cartersville* (41 Georgia Reports, 157,) *unanimously* decided that an act of the General Assembly, which was not signed by the Governor within the time prescribed by the Constitution, was *not a binding law.* In that case this Court said: "The Constitution of the State is the fundamental law of the State, and if bills introduced into the General Assembly are not passed and approved in accordance with the requirements and provisions of that Constitution, they have no binding force or authority upon the people thereof as *laws."* In view of the obligation imposed on me as a judicial officer, to support and maintain the Constitution of the State, and for the reasons heretofore expressed, I am of the opinion that the judgment of the Court below, in this case, should be reversed on both the grounds specified in the bill of exceptions.