## 27611. INDEPENDENT BANKERS ASSOCIATION OF GEORGIA, INC. v. DUNN et al.

UNDERCOFLER, Justice. This suit seeks to compel the Superintendent of Banks of the State of Georgia (now Commissioner of Banking and Finance (Ga. L. 1972, p. 1198)) to institute civil action against the Citizens & Southern National Bank and the Citizens & Southern Holding Company to enjoin them from allegedly violating the provisions of the Banking Law of Georgia which restrict the stock ownership or control of other banks. The suit was brought by the Independent Bankers Association of Georgia, Inc., whose

membership is composed of 209 independent banks. Joined as defendants in the instant action are the Citizens & Southern National Bank and the Citizens & Southern Holding Company. Also joined as defendants are the following banks in which it is alleged that the Citizens & Southern National Bank and the Citizens & Southern Holding Company either jointly or separately own or control more than the allowable limit of stock: Citizens & Southern Bank of Thomas County, Citizens & Southern Bank of Milledgeville, Citizens & Southern Bank of Hart County, Citizens & Southern Bank of Dalton, Citizens & Southern Bank of South DeKalb, Citizens & Southern Bank of Cobb County, Citizens & Southern Bank of Tifton, Citizens & Southern Bank of Colquitt County, Citizens & Southern Bank of Jackson, and First State National Bank (Bainbridge).

The evidence shows:

(1) The Citizens & Southern National Bank owns all of the capital stock of the Citizens & Southern Holding Company. All officers of the Citizens & Southern Holding Company are paid by the Citizens & Southern National Bank. The Citizens & Southern National Bank lends money to the Citizens & Southern Holding Company without interest. At the time of this hearing the amount was $10,000,000. Mills B. Lane, President of the Citizens & Southern National Bank and President of the Citizens & Southern Holding Company for 25 years and now Vice President of the Board of Directors of Citizens & Southern National Bank testified, "What is the difference, it is all owned by Citizens & Southern . . . when Citizens & Southern lends $10,000,000 to Citizens & Southern Holding Company, it is lending money to itself. . ."

(2) The Citizens & Southern Holding Company owns a 5% stock interest in each of the ten five per cent banks named in the complaint.

(3) Counsel for Citizens & Southern stipulated, "Various officers, directors and shareholders of the Citizens & Southern National Bank acquired stock in six of the ten five per cent defendant banks within thirty days subsequent to the Citizens & Southern Holding Company's acquiring five per cent stock ownership in said banks, the six banks being the Citizens & Southern Bank of Thomas County, Citizens & Southern Bank of Hart County, First State National Bank (Bainbridge), Citizens & Southern Bank of Dalton, Citizens & Southern Bank of South DeKalb, and Citizens & Southern Bank of Jackson. Second, a majority of such purchasers of stock in those six banks was funded through loans made by Citizens & Southern banks throughout the State of Georgia, including other associate correspondent banks."

(4) It was stipulated by counsel that, "The officers and directors of the Citizens & Southern National Bank who acquired stock in the ten five per cent defendant banks were also shareholders in the Citizens & Southern National Bank."

(5) It was stipulated by counsel that, "The President of each of the ten five per cent defendant banks was formerly either an officer of the Citizens & Southern National Bank or an officer of another bank in the Citizens & Southern system of banks." Other than qualifying shares to become a member of the board of directors, each president purchased additional stock, generally about five per cent, which was posted as collateral for loans from the Citizens & Southern National Bank or associate correspondent banks. For the most part these loans were substantial loans on demand notes, the principal of which has not been reduced or substantially reduced. It was also stipulated that each of the ten five per cent defendant banks has one director who is an executive officer of the Citizens & Southern National Bank. Mills B. Lane testified: "Q.

You do know that no president of one of these banks, these five per cent banks would be elected without your approval? A. Up to now this has been so."

(6) The ten five per cent banks participate with the Citizens & Southern National Bank in the following programs: (a) pension plan, (b) employee profit sharing plan, (c) group insurance, (d) educational facilities, (e) recreational facilities, (f) transfer of personnel, (g) trust department and investment counseling, (h) joint printing, and (i) "anything else that a five per cent bank cannot provide for itself."

(7) The Citizens & Southern Holding Company requires each president of the ten five percent banks to establish goals and objectives each fall for the coming year. The performance of each president is evaluated each year and salary increases are recommended based upon this evaluation.

(8) In at least some instances the purchase of the stock in the defendant five per cent banks was handled by officers of the Citizens & Southern National Bank and resold to selected individuals. Peyton Anderson, a substantial stockholder of the Citizens & Southern National Bank and a former director of the Citizens & Southern National Bank and the Citizens & Southern Holding Company testified that 2428 shares of stock in the Milledgeville Banking Company once registered in his name were handled as follows:"What happened was this. I asked Mr. Lane if he would sell me some interest in some of these 5 per cent banks. I had some money to invest. I had seen what they had done under C & S management and as an investor I wanted some stock in these five per cent banks. He came back to me and asked if I would sign a note that some of the banks were in the process of being, coming into the five per cent family and would I give him a note for a million seven hundred fifty thousand dollars to be used for the purchase of these banks and then he, in turn, would let

the whole account be handled by Ralph Eubanks. I authorized, I signed the note, and I authorized Ralph Eubanks to handle the complete transaction which I was to get these stocks that I mentioned, that I have bought. The entire transaction was handled by Ralph Eubanks and the only thing that I have seen in connection with it is this letter from Bill Green with the list of things you have got there and I have never looked at any of these other papers you asked for, even though I have them in the office, I have never opened it and looked for it. The only thing that I was concerned about was to do a favor to Mills Lane by signing a note for a million, three-quarters, and in turn, get myself stock in these minority banks and not let it cost me anything. That's what has happened and that's all I know. I haven't seen any certificates. I haven't looked at any certificates and I authorized Ralph Eubanks to handle everything in connection with it."

Mills B. Lane testified in explanation of this arrangement, "The Federal Reserve Board asked us not to buy any more stock in the name of Mills B. Lane, Jr., agent, and we asked Robinson-Humphrey to take this price and Robinson-Humphrey said, 'We will do this,' and because of certain New York Stock Exchange requirements I asked Peyton Anderson if he would accommodate me by warehousing the stock. Q. You told him to sign a note for $1,750,000? A. I asked him, I couldn't tell him anything. Q. And that it wouldn't cost him a dime? A. I didn't tell him anything. Q. You didn't tell him that it wouldn't cost him a dime? A. We would give him an interest-free loan to warehouse the stock and an opportunity to buy some of it. Q. And it wouldn't cost him a dime to sign the note? A. Right. Q. You had stock from Robinson-Humphrey issued to Peyton Anderson and had Mr. William E. Green or Rountree Youmans sign for it? A. I don't think I had this done, I was eliminated from the transaction, after

this I wasn't involved in it. Q. You knew that it would be handled, you turned it over to Mr. Youmans and Mr. Green? A. I turned it over to Mr. Green."

Alexander Yearley IV, Chairman of the Board of Directors of Robinson-Humphrey Company which is in the business of buying and selling securities, testified that after July 15, 1969 it purchased 2818 shares of stock of the Milledgeville Banking Company at $230 per share upon the recommendation of Mills B. Lane. Thereafter on July 24, 1969, 500 shares were sold to the Citizens & Southern Holding Company and 2318 to Peyton Anderson. Mr. Yearley stated, ". . . First of all, this is the first time which we ever engaged in a transaction of this kind. The New York—we are members of the New York Stock Exchange. Stock Exchange regulations require that when you buy and own stock as we did in this case, we were the sole owners of it, that you have to segregate part of your capital to offset that purchase. In normal transactions involving stock, the amount of capital which you must segregate is thirty per cent of the value of the stock. In this particular instance, we brought it to the attention of the Stock Exchange and they said that since this stock had no quoted market, which it didn't—you couldn't find Milledgeville Banking Company quoted in any paper—that you would be required to segregate a hundred per cent of the value of the stock and charge that against your capital. We are in the business of buying and selling securities. We use our capital and turn it over rapidly, and we felt that this—at this stage of the game that this was not a particularly advantageous purchase for us, that it might be some period of time before it could be sold. We called the C & S Bank and told them that we were going to immediately begin to distribute the stock. If they had people to whom they'd like it offered, we'd be delighted to offer it to them, and this resulted in the sale to Mr.

Anderson. But this is what led us to take action quickly to move the stock. Now, number two, we did indeed get a very small commission from the C & S Bank for our efforts. In connection with this transaction and the Citizens Bank of Hartwell, we got a commission of $5,000, which is about a fourth of what the Stock Exchange commission would have been on the transaction." The stock was later transferred from Peyton Anderson to others.

William E. Green, Secretary-Treasurer of the Citizens & Southern Holding Company testified that he receipted in the name of Peyton Anderson for 2428 shares of stock worth approximately $985,000. Mr. Green stated: "It would have been a very easy thing for a bank our size to have floated this amount among the officers until we could have somebody else to warehouse the stock, to find somebody to sell it but we didn't want to do this, this would be a violation of the law and we are extremely careful to not violate the law and we went to Mr. Anderson and asked him to temporarily hold the stock until we could find someone who would make distribution." Peyton Anderson stated that he never saw the stock certificate, never signed the stock transfer or assignment, never issued a check for it and never authorized Green to receipt for it. The record shows other stock acquisitions and sales during July and August, 1969 in the name of Peyton Anderson in the Citizens Banking Company, Hartwell, Georgia and the Citizens & Southern Bank of Thomas County involving over $1,000,000.

(9) William E. Green also testified that he acquired 8755 shares of stock in the Citizens & Southern Bank of Jackson as agent on about September 1965. He borrowed money to pay the purchase price from the Citizens & Southern Holding Company. He held the stock as agent until about February 1968 and voted it during the three years he held it before it was sold and

transferred to other purchasers. In February 1968 he transferred the last 5700 shares of this stock to the Citizens & Southern National Bank as trustee under three agreements with Mills B. Lane for Ann Waring Lane, Mills B. Lane, Jr. and Anita W. Lane.

(10) The original application for charter of the Citizens & Southern Bank of Dalton was rejected by W. M. Jackson, Superintendent of Banks for the State of Georgia, because Citizens & Southern officers had subscribed to too much stock in it. Mr. Jackson stated: "Let's slow down a little bit on this point. The application was filed for charter by the people of Dalton and an investigation was made by our examiner and when his report was turned in to me involving the ownership of the stock is when I first knew what percentage the C & S group had. After I reviewed the findings of the examiner, I believe his record showed the group had about fifty to sixty per cent of the stock, I can't say fifty or sixty. Q. The C & S group? A. Yes, sir, so I contacted Homer Fuller selected by the group, he was up there to head the bank as president and I informed Mr. Fuller I would not consider granting the charter until he revised the stock holdings in the bank, the list to show more representative ownership of the local community. He asked me what per cent would he be required to reduce the C & S group holdings and I told him to thirty per cent, including the five per cent of the Holding Company and I told him to submit a revised stockholders list and when he did, showing the stock had been transferred into local ownership, I approved it on that basis. Q. It shows stock ownership that had been C & S bought with eight checks from five hundred to thirteen hundred shares, approximately? A. You mean at the time? Q. When it came back to you. A. Approximately, they were local people. The Court. Let me clear up this point, this was a little different from the Milledgeville situation? The witness. Yes, sir,

this was an acquisition of a new charter, that is correct. The Court. And as you consider it, you have no discretion that would permit you to let the Holding Company own more than five per cent of the stock? The witness. There is a law prohibiting that. The Court. You would have no discretion about that? The witness. That's right. The Court. But when it came to acquiring a charter you considered that you had discretion and were to decide on your overall judgment of what was best for the community? The witness. That is correct. The Court. That is what I gathered. The witness. That is exactly correct. I might add this, too, as long as I was superintendent of banks for eight and a half years and I never granted one charter where the concentration of stock was more than, I would say thirty-five per cent approximately, never granted fifty per cent, however, I don't think that would have been illegal. The Court. It was a matter of your discretion? The witness. That is correct, in the interest of the community. Let me say this, please, to anybody, not just C & S Holding Company or any holding company, I treated the Holding Company like I did anybody else. Q. What I want to ask you now is, did you tell Mr. Mills B. Lane or Homer Fuller to tell Mr. Lane that it would be all right to show sixty-four hundred shares in those directors and it would be all right to transfer that stock to Mrs. Lane and you would approve the charter? A. No, I don't know that I recall that language, I think there was discussion with Fuller about him transferring something into some of the directors' names and they would farm it out to local people, that was the size of it, I don't recall Mrs. Lane or anybody else. Q. If it had been brought to your attention that Mr. Fuller or Mr. Lane had had sixty-four hundred shares in their name and Mrs. or Mr. Lane had paid $160,000 and had taken a blanket transfer, would you have approved? A. I think that would have been within

the limitation I set on it, if it was within the thirty percent it would have been all right to do this. Q. You don't recall that, did you know about it? A. Well, I'm certain I did. Q. Did you make any inquiry to see whether the directive had been complied with? A. The new list was submitted in writing, it appeared to be in order and we accepted it. Q. You didn't send an examiner out anymore? A. I don't suppose we did. Q. The sixty-four hundred shares which had been in Mrs. Lane's name constituted sixteen per cent of the stock, this didn't interest you? A. I think it was all included in the thirty per cent, I stated the limitation and it made no difference whether it was Mr. Lane's or Mrs. Lane's or anybody else's. Q. You didn't make any inquiry to see whether this sixteen per cent was on the list that was submitted? A. The adjustment was made and I accepted it. Q. And it then showed about thirty per cent of the stock was owned by the officers, by C & S officers and the Holding Company? A. That is correct." Mills B. Lane testified that the Superintendent of Banks stated that "he could not control what happened to stock after it was sold—for the purpose of face saving—but that other names would have to appear if a charter were to be granted and if the stock is sold to someone else or transferred to someone else the banking department has nothing to do with that—this is where I made a personal judgment that is a blot on my banking career, I took the suggestion, other names appeared on the list I prepared. I bought the stock or rather than those people." Eight local applicants for the charter represented that they had subscribed for 1300 shares each when in fact they intended to subscribe for 500 shares each. The 6,400 shares were later transferred to officers or stockholders of the Citizens & Southern National Bank and other selected persons.

William M. Jackson, former Superintendent of Banks

testified that in his opinion the Georgia Banking Law did not restrict any individuals from buying stock of banks in any amount. He was aware of the stock ownership in the different banks.

(11) Mills B. Lane further testified that the following is an accurate statement. "That you wouldn't have bought five per cent of the stock of those banks, that is the ten banks we have named here, without anticipating or hoping to acquire more stock of those banks for the officers and friends as you call it of the C & S Bank."

(12) Mills B. Lane also testified: "Q. I believe, Mr. Lane, it is a fact that you testified, isn't it, that you have never been faced with a situation where a stockholder in one of these five percent banks who also was an officer or director of the bank tried to undermine a decision which was made by an executive of the Holding Company? A. You might say I never faced that, sir, not that I know of. We have open discussion among ourselves, they are not yes men, they express their opinions but a group decision holds for everybody. Q. By group decision this means that when you and Mr. Glenn and Mr. Hall and Mr. Youmans reach a decision you expect everybody to abide by it and respect it? A. How could you run a business otherwise."

(13) The purchase of stock in the Citizens & Southern Bank of Thomas County was as follows: "A. Well, the way we handled this one was we put a deposit, the C & S put a deposit with the bank in Thomas County to cover purchases of these certificates, so that when anybody wanted to sell stock they could pay for it out of the account and could advise us so that we could then in turn collect the money from up in Atlanta from whoever wanted to buy it."

(14) Joseph A. Hall, III, first Vice President of the Citizens & Southern National Bank and President of the Citizens & Southern Holding Company testified

that the Citizens & Southern employed all the officers and people originally in the Citizens & Southern Bank of South DeKalb, that over fifty per cent or more of the stock from its inception was held by Citizens & Southern Holding Company or officers, employees and wives of officers and employees of the Citizens & Southern National Bank or in various trusts operated by Citizens & Southern National Bank, some of which stock acquisitions were financed by the Citizens & Southern National Bank and that it is virtually, but not actually, a branch bank.

The Independent Bankers Assn. of Georgia, Inc., moved for a jury trial. This was denied and the trial court heard the matter without a jury.

The trial court found: "(1) The Citizens & Southern National Bank owns all of the capital stock of the Citizens & Southern Holding Company. ' (2) The Citizens & Southern Holding Company holds direct ownership and control of five per cent of the voting shares of each of the ten associated correspondent banks named as defendants in this action. (3) The defendant holding company acquired title to the five per cent of the stock of the correspondent banks in all cases after being invited by the owners of the banks to participate in the ownership of such bank. (4) Simultaneously with the acquisition of stock by the holding company, officers, agents, employees, relatives and friends of the Citizens & Southern National Bank acquired stock in varying amounts in each of the ten associated correspondent banks. (5) The Citizens & Southern Holding Company does not hold direct or indirect ownership or control of any of the voting shares of the ten associated correspondent banks over and above the five per cent allowed by law. (6) The Citizens & Southern National Bank does not hold direct or indirect ownership or control of any voting shares of the ten associated correspondent banks

except in good faith in a fiduciary capacity. (7) The only interests which the Citizens & Southern National Bank holds in any other shares of stock in the ten defendant associated correspondent banks are collateral security interests obtained and held by said bank in the regular course of security debts previously contracted in good faith, none of which shares have been transferred into the name of said bank; however, the court will note that in the case of one of the associated banks, namely, the Citizens & Southern Bank of Cobb County, the Citizens & Southern National Bank holds a debenture which provides that the title to the stock may be transferred into the Citizens & Southern National Bank. The court notes that this is an illegal provision if it were to be exercised. The court does not feel it has the power to direct, but it suggests that steps be taken by the bank and that the Commissioner of Banking and Finance of the State of Georgia see that such steps are taken whereby the Citizens & Southern National Bank will be divested of its interests in such debenture. Also the court notes with disapproval the fact that in all of the defendant associated banks, stocks in such banks have been pledged as collateral to the Citizens & Southern National Bank and that in payment thereof, many of the subscribers to such stocks have given notes and other security instruments to the Citizens & Southern National Bank which may be foreclosed whether the moneys secured by said instruments are due or not. The court notes that this power has never been exercised but the court further suggests to the defendant Citizens & Southern National Bank and to the Commissioner of Banking and Finance of the State of Georgia that this provision for foreclosure when no moneys are due under these instruments should be withdrawn from such instruments. The court states that if there had been an attempt to secure stock by

this method this court would hold such was an illegal and indirect method of control of the voting stock. (8) Voting shares in each of the ten associated correspondent banks acquired by the officers, directors, employees and shareholders of the Citizens & Southern Holding Company and the Citizens & Southern National Bank and associated banks and the wives or families of such were acquired and/or held for their own interests in good faith as bona fide investments and neither the Citizens & Southern National Bank nor the Citizens & Southern Holding Company has direct or indirect control of such shares or the voting thereof. (9) At the time demand was made by the plaintiff upon the then Superintendent of Banks, now named Commissioner of Banking and Finance, to bring an action, and at all times subsequent thereof, the Superintendent and/or Commissioner of Banking and Finance of the State of Georgia was either aware of, or information was available to him by which he could have become aware of the foregoing facts. The court makes the following conclusions of law: The court concludes that there exists no violation of Georgia Code Ann. § 13-207 on the part of the Citizens & Southern Holding Company, the Citizens & Southern National Bank or the ten associated correspondent banks named as defendants herein. The court further concludes, therefore, that the defendant Commissioner of Banking and Finance of the State of Georgia (formerly the Superintendent of Banks) had the right in the exercise of his discretion to refuse plaintiff's demand that he institute an action against the other defendants herein. Wherefore, judgment is granted the defendants against the plaintiff, the costs to be taxed to the plaintiff as required by law."

The Independent Bankers Assn. of Georgia, Inc., appeal and present to this court the following issues for decision: (1) Did the trial judge err in denying the

appellant's motion that the issues of fact in the case be submitted to a jury? (2) Did the trial judge err in requiring the appellant to amend its complaint or suffer the penalty of having it dismissed? (3) What is the correct construction of the words "which directly or indirectly owns, controls, or holds, with power to vote, more than five per cent of the voting shares" in § 13-201.1 (e) of the Code? (4) Do the words defining "company" in § 13-207 (b) of the Code "and includes the shareholders and those persons who otherwise own the 'company' " include the officers, employees and directors of the Citizens & Southern National Bank who acquired their shares in the named banks simultaneously with the Holding Company and with knowledge that the Holding Company was acquiring five per cent of the shares of such bank? (5) Does the provision in the notes held by the Citizens & Southern National Bank and its subsidiaries given by the officers, wives of officers, employees and former officers of the Citizens & Southern National Bank to secure the payment of shares bought in these ten banks reading as follows, "In addition to all other rights possessed by it, the holder from time to time, whether before or after any of the liabilities shall become due and payable, may (a) transfer all or any part of the collateral into the name of the holder or its nominee, with or without disclosing that such collateral is subject to the lien, security title and security interest hereunder," constitute indirect control with power to vote of the shares so assigned to the Citizens & Southern National Bank or its subsidiaries? and (6) Does the Commissioner of Banking and Finance have the right to exercise discretion as to whether or not he shall bring an appropriate action to enjoin a violation of the Bank Holding Company Act? *Held:*

1. In our opinion there are no substantial issues of fact in issue here. The trial court did not err in refusing to

submit the case to a jury. *Holt v. Clairmont Development Co.,* 222 Ga. 598 (151 SE2d 151).

2. The Superintendent of Banks (now Commissioner of Banking and Finance) is vested with a broad discretion in the supervision of banks. However, an action in the nature of mandamus is an appropriate remedy to compel him to take action to restrain a clear violation of the banking law. Ga. L. 1919, pp. 135, 187; 1949, pp. 309, 310 (Code Ann. § 13-1701).

3. Georgia Laws 1970, pp. 954, 961, provides: "The Superintendent of Banks of this State may bring an appropriate civil action to enforce any provision of this Chapter whether by injunction, or otherwise, in any superior court of this state having jurisdiction of one or more of the defendants." (Code Ann. § 13-208). "The true rule for the construction of the word *may* in a statute is, that when such statute concerns the public interest, or affects the rights of third persons, then, the word *may,* shall be construed to mean *must* or *shall."* *Birdsong v. Brooks,* 7 Ga. 88, 89; *Kilgore v. Paschall,* 202 Ga. 416, 418 (43 SE2d 520).

4. There are two conflicting philosophies concerning the banking business. There are those who believe that the control of additional banks by large financial interests will ultimately destroy independent banks and result in the domination of the economy by too few persons. There are those who believe that larger financial interests can offer a wider variety of services and can better provide the capital to meet the needs of borrowers.

This conflict must be resolved by the legislature and not by this court. Our authority is limited to the interpretation and application of the legislative determination. The legislative intent is expressed clearly in the banking laws which provide in Section 1 (Ga. L. 1960, pp. 67, 68): "It is the intent of this Act to prevent the extension of statewide banking by any

institution and to encourage the normal growth of banking units in the local communities. . . It is the intent of this Act to restrict further the acquisition of voting shares of banks by bank holding companies. It is the intent of this Act to keep banking units from expanding into territories beyond their municipal corporate limits." (See Sec. 1 of Ga. L. 1970, p. 954: "Territorial criteria for the establishment of and operation of bank offices and bank facilities shall be the county territorial limit.")

To accomplish these purposes, the banking law, among other things declares, "(a) On and after the effective date of this section, it shall be unlawful (1) for any action to be taken which results in a company becoming a bank holding company as defined in this Title; (2) for any bank holding company to acquire or hold direct or indirect ownership or control of more than 5 per centum of the voting shares of any bank." Ga. L. 1960, pp. 67, 74 (Code Ann. § 13-207 (a)).

The Citizens & Southern Holding Company became a bank holding company prior to the effective date of the 1960 Act. Its existence and its bank stock holdings acquired prior to said act together with certain accretions are approved and permitted by the Act. But thereafter the acquisition and holding of direct or indirect ownership or control of more than five per cent of the voting stock of any bank is prohibited. Also as provided in the Act, a bank holding company "includes the shareholders and those persons who otherwise own the 'company'." Ga. L. 1960, pp. 67, 74 (Code Ann. § 13-207 (b)). Therefore, under the Act, bank stock acquired after the effective date of the Act and held by such owners is attributed to the bank stock held by the bank holding company. In this case the Citizens & Southern National Bank is the sole owner of the Citizens & Southern Holding Company and the corporate entities have been disregarded. The

corporate veil has been pierced. It follows that the shareholders of the Citizens & Southern National Bank are "persons who otherwise own" the Citizens & Southern Holding Company. It is admitted that since the adoption of said Act certain shareholders of the Citizens & Southern National Bank acquired and hold voting stock in the ten five per cent defendant banks. When their ownership of bank stock in the ten five per cent defendant banks is thus attributed to the ownership of the Citizens & Southern Holding Company's bank stock in these same ten five per cent defendant banks, the five per cent limitation of the banking law is exceeded. If a bank holding company or a company does not hold direct or indirect ownership or control of voting stock of the same bank as its shareholders or persons who otherwise own the banking holding company or company, the attribution clause does not apply. To place any less interpretation upon this clause would render it meaningless. This interpretation does not impair any constitutional prerogatives of individuals. It is a reasonable regulation of banking activities and enacted by the legislature in the public interest.

5. The appellants contend that the evidence demands a finding that the Citizens & Southern National Bank and the Citizens & Southern Holding Company indirectly control more than five per cent of the ten five per cent defendant banks. In the alternative, the appellant contends that this is an issue of fact which should be submitted to a jury.

The word "indirectly" signifies the doing by an obscure, circuitous method something which is prohibited from being done directly and includes all methods of doing the thing prohibited except the direct one. Whether control of banks is being exercised indirectly may be difficult to resolve in many instances and contrary conclusions may be validly reached. However, in view

of the declared purpose of the banking law, a finding of indirect control is demanded under certain circumstances.

The officers and directors are the alter egos of the bank. It is clear under the evidence here that they are doing indirectly that which cannot be done directly. The independence of these ten five per cent defendant banks, which the banking Act seeks to preserve, is lost. We hold that the Citizens & Southern National Bank and the Citizens & Southern Holding Company are directly and indirectly holding and controlling more than five per cent of the voting stock of the ten five per cent defendant banks.

It follows that the Citizens & Southern National Bank has become a bank holding company under the provisions of the banking law which provides: "The term 'bank holding company' as used in this Title means any company incorporated or organized under the laws of this state, or doing business in this state, which directly or indirectly owns, controls or holds, with power to vote, more than five per centum of the voting shares of each of two or more banks." Ga. L. 1963, pp. 602, 603 (Code Ann. § 13-201.1 (e)).

The argument that indirect control of bank shares "with power to vote" means a legally enforceable power to vote such stock is without merit. A legally enforceable power is direct control.

We note that the 1960 Act (Ga. L. 1960, pp. 67, 77) repealed the following provision of the 1956 Act (Ga. L. 1956, pp. 309, 310): "A company will be considered to own, control or hold, with power to vote, stock indirectly whenever any officer or shareholders of such company or any natural person included with the definition of 'company' in subsection 2 (b) of this Act or any member of the immediate family of such officer or shareholder or of such natural person, shall own, control or hold with power to vote, such stock.

Immediate family includes a spouse, children, mother, father, brother and sister." This provision was concerned with indirect control and not with attribution. We conclude by the repeal of this provision that the ownership of bank stock by an officer, director or shareholder of a company or members of the family as stated therein does not in itself constitute indirect control by the company. However, it does not preclude a finding of indirect control when, as here, such is shown by evidence other than mere ownership of the stock and relationship of the parties.

In so far as the courts are concerned, a mandamus to compel the Commissioner of Banking and Finance to act will not issue unless there is a clear violation of the law shown by the record before the court. This rule does not inhibit the Commissioner of Banking and Finance from proceeding with his own investigation to determine if the banking law has been violated and taking action to restrain any such violation.

6. The argument that the deletion of the word "bank" from the definition of "company" in the 1960 act shows an intention not to include banks therein is without merit. Code Ann. § 13-207 (b) describing a "company" is comprehensive and includes banks.

7. The Citizens & Southern National Bank has expressly repudiated the following provision of its notes secured by bank stock in said ten five per cent defendant banks: "In addition to all other rights possessed by it, the Holder, from time to time, whether before or after any of the liabilities shall become due and payable, may (a) transfer all or any part of the collateral into the name of the Holder or its nominee, with or without disclosing. that such collateral is subject to the lien, security title and security interest hereunder."

8. The argument that the rulings herein could cause a bank holding company to be guilty of a criminal act if a single shareholder unknownst to it acquired

additional bank stock is without merit. See Code Ann. § 13-9938 (Ga. L. 1960, pp. 67, 77) which imposes penalties only upon failure to cease and desist within 60 days after notice of such violation by the Commissioner of Banking and Finance.

9. The test as to whether bank trusts involving shares of other banks violate the banking law is not just whether such trusts are held in good faith in a fiduciary capacity. Code Ann. § 13-207 provides: ". . .these prohibitions shall not apply: . . .(B) to shares acquired by a bank (i) in good faith in a fiduciary capacity, except when such shares acquired after the effective date of this section are held for the benefit of the shareholders of such bank."

10. The trial court erred in not issuing a mandamus as prayed to compel the Commissioner of Banking and Finance to take action against the Citizens & Southern National Bank and the Citizens & Southern Holding Company to enforce the banking law of this state.

*Judgment reversed. Mobley, C. J., Grice, P. J., and Jordan, J., and Judges Andrew J. Whalen, Jr., and W. Colbert Hawkins, concur. Hawes, J., dissents. Nichols and Gunter, JJ., disqualified.*

ARGUED DECEMBER 12, 1972 — DECIDED MARCH 5, 1973 — REHEARING DENIED MARCH 26 AND MARCH 30, 1973.

*Martin, Snow, Grant & Napier, Charles M. Stapleton,* for appellant.

*J. Robin Harris, Daniel B. Hodgson, Ronald L. Reid, Ben F. Johnson, III, Alston, Miller & Gaines, Philip H. Alston, Jr., Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Robert J. Castellani, Assistant Attorney General,* for appellees.

*Hansell, Post, Brandon & Dorsey, McChesney H. Jeffries,* amicus curiae.

HAWES, Justice, dissenting. At the outset, I would like

to say that I am in accord with the majority opinion that mandamus is the proper remedy for clear violations of the Bank Holding Law not acted upon by the Commissioner of Banking and Finance, and that the appellant Independent Bankers were not otherwise entitled to a trial by jury, there appearing no essential issue of fact in dispute. I confine these remarks, therefore, to the question of whether the Bank Holding Law has been violated.

The Citizens and Southern Bank Holding Company is a wholly-owned subsidiary of the Citizens and Southern National Bank. The Bank Holding Company as a corporate entity owns voting stock shares not in excess of five per centum in various affiliate or associate correspondent banks. For purposes of this appeal, the parent National Bank does not own as a corporate entity any stock interest in the various affiliate banks, the trial court having ordered revision of the single debenture convertible to the capital stock of one of the affiliate banks and held by the National Bank, and the National Bank having expressly repudiated the transfer provisions of certain demand notes with affiliate bank stock as collateral received by the National Bank in return for loans to individual stock subscribers. Any other affiliate bank stock holdings of the National Bank are those held in trust or in a fiduciary capacity. The trial court has determined as a fact that shareholders of the parent National Bank obtained their stock interests in the affiliate correspondent banks in good faith as bona fide investments for their own personal gain. There was no showing in the trial court of the existence of any conspiracy between the National Bank, its Holding Company, and its shareholders to control the voting of such stock interests in the affiliate banks either by way of voting trust, proxy, shareholder agreement or the like. In view of these facts, the essential question presented by this appeal narrows to whether the Georgia Bank

Holding Law, Code Ann. § 13-207 (Ga. L. 1960, p. 67) is violated when in addition to the five percent voting stock interest a wholly-owned bank holding subsidiary has in various affiliate banks, there is also ownership of voting stock interest in such banks by individual shareholders of the parent national bank.

The majority of this court has determined that the Bank Holding Law has been infringed under such circumstances upon the reasoning that there is no separate corporate identity between the Bank Holding Company and the parent National Bank and by a process of attribution under the Bank Holding Law, Code Ann. § 13-207 (b), and by way of pass-through, the individual stock interests of the shareholders of the parent National Bank in the affiliate banks must be included among the holdings of the Bank Holding Company so that it has "direct or indirect ownership or control of more than five percent of the voting shares of any bank" in violation of the statute. I believe this is an incorrect reading of the Bank Holding Law in view of the legislative history of the statute and in view of other considerations hereinafter noted.

The Georgia Bank Holding Law of 1960 was the result of a process of legislative experiment, error and revision. It is representative of a movement throughout the nation to curb what was recognized as an evolution toward the concentration of financial power in a few large banking institutions. This movement came to fruition in 1956 with the passage of national legislation which included the Bank Holding Company Act, 12 U. S. C. §§ 1841-1849 (1964), and with the passage of state legislation as an adjunct to retard monopolistic tendencies at the state level. In 1956, the State of Georgia also adopted similar legislation whose purpose was to set an absolute limit upon the amount of stock interests a bank holding company and its shareholders might have in other affiliate banks. (Ga. L. 1956, pp. 309-312). At that time the

holding company, together with its shareholders, could own or control no more than 15 percent of the voting stock in each of two or more banks, the shareholder voting stock interests in the affiliate banks being specifically attributed to the holding company.[1]

Because the Bank Holding Law of 1956 was concerned with the concentration of wealth and not with banking practices as such, it turned out not to be a workable solution to the problem because of resulting adverse effects upon bank competition and upon bank and financial growth in the state, relating thereby to the question of general economic expansion particularly in the regional areas.[2] The issue, so far as legislation was

---

[1] The attribution clause of the 1956 Act read as follows: "A company will be construed to own, control, or hold, with power to vote, stock indirectly whenever any officer or shareholder of such company or any natural person included within the definition of 'company' in Section 2 (b) of this Act or any member of the immediate family of such officer or shareholder or of such natural person, shall own, control or hold, with power to vote, such stock. Immediate family includes a spouse, children, mother, father, brother and sister." Ga. L. 1956, pp. 309, 310.

[2] The controversy over branch banking, merger, and holding company laws has continued up until the present time: see Myers, *Affiliations, Mergers, Help Small Banks Cut Big-Time Business,* Wall Street Journal, Jan. 19, 1973, and Walker, *Banking Laws Starve Atlanta of Capital?* The Atlanta Journal and The Atlanta Constitution, Dec. 10, 1972, at page 1-E. In this regard, see generally Smith and Greenspun, Structural Limitations on Bank Competition, 32 Law & Contemp. Prob. 635 (1967), and Note, Bank Charter, Branching, Holding Company and Merger Laws: Competition Frustrated, 71 Yale L. J. 502 (1962).

concerned, was how best to retard the evolution toward concentrated power in large banking concerns while at the same time to adapt institutions and laws to meet economic reality, and further, how to retain as well the human-economic values of laissez faire and of individualism. The result was the reduction of the amount of voting stock interest a bank holding company could acquire in affiliate banks, 15 to 5 percent, but at the same time the complete elimination of the former attribution clause of the 1956 Act.[3] The Bank Holding Law of 1960 represented a compromise between concentrated enterprise on the one hand and individual shareholder initiative on the other. By it the combined voting power of the holding company and of its shareholders would not be precluded as a result of ownership in the affiliate banks even though such ownership exceeded the 5 percent voting stock interest. The holding company would be restricted in its accumulation of stock interests and in its ability to bring to bear as a corporate entity its concerted power over the affiliate banks represented by such interest, but the shareholders were left to vote their interests as they willed, whether or not they conjoined with those of the holding company.

---

[3] The Report of the Bank Holding Company Study Committee, pursuant House Resolution No. 358, dated January of 1970, makes it clear beyond doubt that the Bank Holding Law of 1960 contains no attribution clause. Evidence of this fact is further supported by H. B. 396, introduced in the current legislative session of the General Assembly, an effort to revert verbatim to the attribution provisions of the Bank Holding Law of 1956. I note here that similar bills have been introduced in previous sessions. Compare H. B. No. 165, Georgia General Assembly, 1973 Session.

The Bank Holding Act of 1960, as well as its predecessor, however, envisioned the occasion when, though the provisions as to ownership were not infringed, the holding company and its shareholders might come together directly or indirectly and exercise control over the voting stock of various bank affiliates by way of association, agreement, or the like, so that voting power would not be dispersed but would be effectively concentrated—again what the Act sought to prevent. It was on such an occasion that the shareholder interests would be included among those of the bank holding company, and this accounts for the present definition of "company" within the meaning of the Act; that is, in such instances the bank holding company would include "the shareholders and those persons who otherwise own the 'company.'" Code Ann. § 13-207 (b). Any other meaning for this provision would be inconsistent with the legislative history of the act and with its overall purpose.[4]

In summary, the Georgia Bank Holding Law of 1960 through its operative provisions sought to regulate the "company" as defined by the Act and not persons or individual shareholders of such company acting independently; it sought to prevent a company's direct ownership of voting stock interests in other banks, not to

---

[4] See Report of the Bank Holding Company Study Committee, supra, at Note 3. Code Ann. § 13-207 (b), which appeared in both the 1956 and 1960 Acts, provides in full: "The term 'company' as used in this section and in section 13-201.1 (e) means any corporation, partnership, foundation, joint stock company, business or voting trust, association or similarly organized group of persons, whether incorporated or not, and includes the shareholders and those persons who otherwise own the 'company' and including any foreign corporation or other organization or association doing business in Georgia."

exceed five per cent; and it sought to prevent a company's ability to otherwise control voting stock interests in other banks in excess of the five per cent ceiling. Under the provisions of the Act, a company's control of excessive concentrations of voting stock in other banks related exclusively to the ability to command "with power to vote" the voting of such stock interests. Code Ann. § 13-201.1 (e).

Treating the present case realistically, I am constrained to agree with the majority that this court should look behind the corporate entity of the Citizens and Southern Bank Holding Company, which would be the prerogative and duty of the Commissioner of Banking and Finance, and to inquire into the nature of the overall banking structure. As Judge Cardozo has wisely said, "The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. . . The logical consistency of a juridical conception will indeed be sacrificed at times, when the sacrifice is essential to the end that some accepted public policy may be defended or upheld." Berkey v. Third Avenue R., 244 N. Y. 84, 95 (155 NE 58) (1926). Here, we are dealing with what is essentially a corporate division rather than a subsidiary in the usual meaning of that term. See Murphy, Corporate Divisions v. Subsidiaries, 34 Harv. Bus. Rev. 84-85 (1956). The parent National Bank owns all of the stock of Bank Holding Company. Decisions of the Bank Holding Company are not made independently of the parent National Bank. There is a commingling of officers and directors in the parent and subsidiary, and the Bank Holding Company is reimbursed by the parent National Bank for the salaries of its officers. The parent National Bank has made interest-free loans to the Bank Holding

Company including on one occasion one for ten million dollars. Additionally, as the evidence indicates, the 1970 annual report of the parent National Bank admits of no corporate separation: ". . . the bank owns the Holding Company, and carries its investment at $1. The bank itself is the Holding Company." I believe that upon this rendition of facts and upon equitable principles this court would be justified in concluding that there is no separate corporate identity between parent National Bank and Bank Holding Company, that the Bank Holding Company is a division of the parent, and that they are in fact one.

If there be no separate corporate identity, the shareholders of the parent National Bank would be said to own the Bank Holding Company. However, as I have indicated previously, the voting stock interests of these shareholders in the affiliate correspondent banks would not be attributed to the Bank Holding Company, so that the essential inquiry becomes whether the shareholders and the Bank Holding Company may be said to otherwise control more than 5 percent of the voting stock of the affiliate banks. Under the Bank Holding Law, this would not mean control as may in fact be exercised by the independent voting of the shareholders and the Bank Holding Company, but such control as may be exercised in concert so that concentrated voting power is brought to bear in derogation of individual shareholder prerogative. Although the evidence indicates that in some instances individual shareholders of the parent National Bank have influenced the affairs of the affiliate banks, there is nothing to show that this was the result of conspired and concentrated voting power. The trial court has found, and I believe we are bound to some extent as a result, that the shareholders of the parent National Bank obtained their stock interests in the affiliate banks in good faith as bona fide investments for their own personal gain, indicating there was no initial

intendment as such to come together and assert in the aggregate their voting stock interests. The evidence further discloses no presently existing agreement or subterfuge between the shareholders of the parent National Bank and the Bank Holding Company to accomplish this end.[5]

It should be noted that the Commissioner of Banking and Finance, as well as a number of his predecessors, with the concurrence of the Attorney General,[6] has not

---

[5] As able counsel for appellees has noted in commenting on the evidence, "The trial court found no control of voting shares. How could he have found control? There were no stock powers. There were no irrevocable proxies. There were no voting trusts. There were no shareholders agreements. There was not a scintilla of evidence indicating any power or legally enforceable right over these voting shares except in the individual owners. All of this after a full year's discovery." Appellees' Brief at p. 47. Questioned by both counsel for the appellees and the assistant Attorney General, all shareholders of the parent National Bank before the trial court denied any influence, or knowledge of any influence, having been exerted over them in the voting of their stock interests in the affiliate banks.

[6] William M. Jackson, Superintendent of Banks from 1963 until 1970, and with a long career in the Department of Banking and Finance, testified before the trial court that he and his predecessor, W. D. Trippe, now Chairman of the Board of the Commercial National Bank of Cedartown, had given specific approval to the present bank holding company practices with the advice of the Attorney General of Georgia. Both Mr. Jackson and Mr. Trippe appeared as witnesses before the Bank Holding Company Study Committee of the General Assembly from which it may be inferred the Committee concluded

felt the need to bring into question the practices under discussion, having been acquiesced in for a period approaching some thirteen years. It has been the past practice of this court when construing a statute that contemporaneous administrative construction of the Act, coupled with legislative inactivity, would raise a presumption that the legislation under consideration had not been violated. The latest affirmation of this rule is found in the able opinion of Mr. Justice Grice in *Undercofler v. Eastern Airlines,* 221 Ga. 824 (147 SE2d 436) (1966). This court should not second-guess the regulation of such practices by the Commissioner of Banking and Finance, in whom some discretion must lie, in the absence of a clear showing of abuse in the trial court. The problem of control bears directly on the duties of the commissioner to oversee bank holding companies and to issue regulations in cases particularly where control is brought into question. It is here, rather than with mechanical tests of ownership, that his primary duties under the Act lie. I would allow him as much latitude as possible.

Finally, in concluding, I need refer to the old Latin maxim, "argumentum ab inconvenienti." This maxim calls for the taking into consideration of the inconvenience which the proposed construction of the law would create. As Chief Justice Lochrane said in *Gormley v. Taylor,* 44 Ga. 76 (1871),[7] ". . . yet with all judges, consequences must needs influence consideration.

---

such practices were not in violation of the Bank Holding Law of 1960. See note 3, supra.

[7]Followed by Chief Justice Almand in his concurring opinion in *Plantation Pipe Line Co. v. City of Bremen,* 227 Ga. 1, 11 (178 SE2d 868) (1970).

We should pause upon the enunciation of legal judgments whose effect would be to upset society . . ."; so too must this court pause to reflect upon its present decision. First, the Georgia Bank Holding Law of 1960, by way of Code Ann. § 13-9938, imposes criminal sanctions in the event of violations of its provisions. Under the majority opinion of this court, hundreds, perhaps thousands, of shareholders of bank holding companies throughout the state who purchased voting stock in 5 per cent affiliate banks in reliance upon the advice and consent of three Superintendents of Banks as to the legality of their conduct, would be potentially subject to criminal prosecution. Secondly, involved are other bank holding companies similarly situated with shareholder interests in 5 per cent affiliate banks over the state. Under the ruling of the majority, these bank holding companies will face the alternative of requiring all of its shareholders to divest themselves of all stock interests in all affiliate banks, such interests being attributable to the holding company, or if the shareholders decide not to give up their stock interests in other banks, the holding companies will have to dissolve themselves—at the minimum, to divest themselves of all voting stock interests in the 5 per cent affiliates. Such divestment of shareholder interests or of bank holding company interests would have an effect upon the viability and growth of banking and finance in Georgia too difficult to here determine. Its impact on the 5 per cent banks in the regional and local areas as translated through decreased stock values alone could be large indeed.

It must be stressed these consequences are in no way small ones; they are disruptive and directly affect the economic well-being of the state, and I would not be one to give sanction to them without a clear mandate from the General Assembly. I find no such mandate in the Bank Holding Law as it is presently written.

For the above reasons, it is easy to understand how the

appellees and their counsel may feel that they have been judicially ambushed.

The court below, in preparing its judgment which is quoted in full in the majority opinion, wrote a meticulous decision, correctly applying the law as it had been administered by the Department of Banking and Finance to the facts of this case.

I strongly object to the interpretation of the Bank Holding Law given by the majority. The trial court, in my opinion, was eminently correct, and I would affirm its judgment.