S90G0355. FIRST NATIONAL BANK OF COMMERCE
et al. v. COMMUNITY BANKERS ASSOCIATION OF
GEORGIA, INC. et al.
S90G0357. DEPARTMENT OF BANKING & FINANCE
v. COMMUNITY BANKERS ASSOCIATION OF GEORGIA,
INC. et al.
(394 SE2d 95)

WELTNER, Justice.

We granted certiorari to the Court of Appeals in *Community Bankers Assn. v. First Nat. Bank*, 193 Ga. App. 569 (388 SE2d 387) (1989).

The case arose when a bank holding company filed application with the Georgia Department of Banking and Finance, seeking approval for the proposed acquisition by its banking subsidiary of certain "branch banks" of other banking institutions, by which it sought to operate the acquired facilities as "branch banks" of that banking subsidiary. The commissioner of the department approved the application; other interests within the banking industry filed actions to prohibit the acquisitions; the trial court upheld the commissioner; and the Court of Appeals reversed.

The sole issue of the case is whether, under the provisions of OCGA § 7-1-600 (1), a "branch bank" is the equivalent of a "bank" to such extent that the acquisition of a "branch bank" of another bank

by a bank holding company's banking subsidiary will authorize the operation by that banking subsidiary of the acquired facility as its own "branch bank" within the county wherein the "branch bank" is located.

## Statutory Provisions

1. The following statutory provisions govern the case:

(a) "Bank" shall include "bank office," "bank facility," "parent bank," and "branch bank," unless the context indicates that it does not. [OCGA § 7-1-600 (1).]

(b) "Branch bank" means any additional principal place of business of any parent bank located in a county other than in the county which is specified in the articles of the parent bank and wherein the parent bank is situated. [OCGA § 7-1-600 (5).]

(c) In the event of merger or consolidation of two or more banks . . . where all of the constituent banks shall have either a parent bank or a branch bank located in the same county, then the surviving or resulting bank . . . may retain and continue to operate any or all places of business of each constituent bank as either a branch bank, a bank office, or a bank facility, as is consistent with and may be authorized by this part. In the event of the purchase of substantially all of the assets of a bank, . . . where both the selling and the purchasing banks shall have either a parent bank or branch bank in the same county, then the purchasing bank shall be the parent bank and may retain and continue to operate any or all places of business of the selling bank as either a branch bank, a bank office, or a bank facility, as is consistent with and may be authorized by this part. [OCGA § 7-1-602 (e).]

(d) [A] bank holding company which lawfully controls a bank or has received the requisite approvals under this Code section to acquire control of a bank may, with the approval of the commissioner . . . merge or consolidate such bank with another of such bank holding company's banking subsidiaries or have another of such bank holding company's banking subsidiaries acquire all or substantially all of the assets of such bank and consequently operate as a branch of such other banking subsidiary.

[OCGA § 7-1-606 (e).]

It is of critical importance to this case that the provisions contained in subparagraphs (a), (b) and (c) of Division 1 came into existence with the enactment of Ga. L. 1960, p. 67 et seq.[1] It is equally important that the statute set out at subparagraph (d) was enacted by Ga. L. 1985, pp. 1506-7.

### Legislative Intent

2. (a) The merger provision (subpar. (c), above) governs the continuation of banking activities when one *bank* acquires another, or when two banks become merged into one bank. The bank holding company provision (subpar. (d), above) controls the continuation of banking activities when a *bank holding company*, through its banking subsidiary, acquires another bank. The two statutes may be read together to this effect:

(i) When the corporate structures of *banks* are changed through merger, consolidation, or purchase, the resulting bank may continue to engage in all of the banking activities that were conducted by all of the banks before the changes in their structures.

(ii) When a *bank holding company* effects a change in the corporate structure of its banking subsidiaries through merger, consolidation, or purchase, the resulting bank may continue to engage in all of the banking activities that were conducted by all of the banks before the changes in their structures.

(b) The effect of the 1985 legislation is to extend to *bank holding companies* the same powers (as to merged, consolidated, or acquired banks) as was accorded to *banks* by the 1960 legislation.

3. (a) The case is distilled to this inquiry: Did the General Assembly, in enacting the 1960 Act, intend that a *bank*, by acquiring from another bank one of its "branch banks," would be permitted to extend the acquiring bank's activities into another county by operating, in that other county, the acquired "branch bank" as its own "branch bank?" If that was the intent, then a *bank holding company* would have similar powers under the 1985 Act — and conversely.

(b) The answer to that inquiry is found in the expressed legislative intent of the 1960 Act, as follows:

It is the intent of this Act to prevent the extension of statewide banking by any institution and to encourage the normal growth of banking units in the local communities . . . .

---

[1] See pp. 70, 71, 74-6.

It is the intent of this Act to restrict further the acquisition of voting shares of banks by bank holding companies. *It is the intent of this Act to keep banking units from expanding into territories beyond their municipal corporate limits.* [Emphasis supplied.] [Section 1 ("Legislative intent"), Ga. L. 1960 at p. 68.]

4. This expression of intent is the antithesis of the position espoused by the commissioner and the bank holding company. We hold, for the purposes of the issue before us, that a "branch bank" cannot be equated to a "bank" under the wording of OCGA § 7-1-600 (1). Hence, the acquisition of a "branch bank" by a bank holding company's banking subsidiary cannot authorize the subsidiary to conduct banking activities in the county wherein the "branch bank" was situated.

*Judgment affirmed. Smith, P. J., Weltner, Bell, JJ., Judge William M. Towson and Judge Don A. Langham concur; Hunt and Fletcher, JJ., dissent; Benham, J., not participating. Clarke, C. J., disqualified.*

## APPENDIX.

We have concluded that OCGA § 7-1-600 (1) cannot have the meaning that the commissioner and the bank holding company ascribe to it. What, then, does it mean? The answer possibly may be found in a review of its legislative history.

1. (a) The term "branch" first was used in an 1807 Act incorporating the Planter's Bank of the State of Georgia. The bank was located in Savannah, and was permitted to operate a branch in Augusta under certain restrictions.[2] Thereafter, other banks were chartered by several Acts of the General Assembly, each Act bestowing powers and

---

[2] The Act provided in section 8:

That a branch of the aforesaid bank shall be extended to the city of Augusta, under the superintendence of eight directors, one of whom shall be president, to be appointed by the legislature, whose seats shall be vacated and filled up at the same times and in the same manner, as the president and directors of the bank in Savannah; and the said branch at Augusta, shall go into operation at the same period with the bank in Savannah. [Clayton's Digest of the Laws of Georgia, 1812, pp. 374, 377.]

The General Assembly required a local board of directors controlling each separate branch of the bank. Section 9 of the Act provided:

That the said branch shall at all times be amenable to the "bye-laws," rules and regulations, that may be adopted by the corporation of the Planter's Bank of the State of Georgia. [Clayton's Digest of the Laws of Georgia, 1812, pp. 374, 377.]

This latter provision made it clear that, notwithstanding its separate group of directors, the branch bank was to be subject to the same limitations as the parent bank.

imposing limitations.

(b) The Code of Georgia of 1861 first undertook the general regulation of banking. It provided:

> The term bank includes the parent bank, its branches, if any, and agencies, its officers of every description, and agents, in construing the violation of an obligation or the imposing a penalty for the acts of whom the bank or branches, as the case may be, is bound. [§ 1433, Code of Georgia, 1861.][3]

(c) In 1919, the "obligation" and "penalty" language of the 1861 Act was removed from the definition of "bank," so that the definition as amended read: "The term 'bank' shall include a branch bank unless the context indicates that it does not." Ga. L. 1919, p. 135 et seq. The 1919 Act placed banks under a state regulatory agency for the first time. Additionally, it provided:

> At the time of the establishment of any branch the Board of Directors of the parent bank shall set aside for the exclusive use of said branch such proportion of its capital as may be required by the Superintendent of Banks; in no event less than is required for the organization of a bank in the city, town, or village in which the branch shall be located. [Id. p. 136.]

(d) The 1960 Act, Ga. L. 1960, pp. 70-71, enlarged the 1919 definition of "bank" to include "parent bank," "branch bank," "bank office," "bank facility," and "bank holding company," and remains unchanged in its codified form, OCGA § 7-1-600 (1). The 1960 Act eliminated the provisions of the 1919 Act requiring the allocation of a proportion of a bank's capital for the use of its "branch bank."

2. The thread between the 1807 Act and the 1960 Act may be traced in this manner:

(a) The 1807 Act required a separate governance for the branch bank that it authorized, but pointed out that the branch bank must abide by the "bye-laws" of the parent bank.

(b) The 1861 Act stated that the term bank includes, inter alia, the term branch bank "in construing the violation of an obligation or the imposing of a penalty for the acts of whom the bank or branches, as the case may be, is bound."

(c) The 1919 Act broadened the definition of the 1861 Act by eliminating the "penalty" and "obligation" modification, but placed

---

[3] Each successive Code of Georgia (i.e., those of 1866, 1868, 1873, 1882, 1895, and 1910), included the same definition.

banks under a state agency and required specific capital allocation for branch banks.

(d) The 1960 Act eliminated the capital allocation required by the 1919 Act, and modified the "branch bank" definition to its present form.

3. It is not inconsistent with this legislative history to suggest that the existence of OCGA § 7-1-600 (1) may be but a vestigial remainder, devoid of substantive content. It is likely that the General Assembly was anxious to affirm that its earlier requirements of separate governance and capital allocation for branch banks would not relieve parent banks of responsibility for the conduct of their branch banks, nor free branch banks from the strictures of their parent banks. That affirmation was hardly necessary, however, as parent and branch are a single entity,[4] and the doctrine of respondeat superior has been established firmly throughout the legal history of our state.

*In fine*, the equation of branch banks to banks in the present statute appears as little more than a truism.

FLETCHER, Justice, dissenting.

In this case, a bank holding company filed applications with the Commissioner of the Georgia Department of Banking and Finance, seeking the Commissioner's approval for subsidiaries of the holding company to acquire the assets, and assume the liabilities, of one branch bank operated by a federal savings and loan association and three branch banks of a federal savings bank. The parent banks of the selling banks have their principal places of business in Fulton County, and the branch banks are located in four different counties. One of these four banks was at the time of its acquisition a savings and loan association with all of its bank facilities being located in one county; when it was acquired in 1981 by the federal savings and loan association, it then became a "branch bank."

The question for decision is whether the Commissioner is authorized to approve a bank holding company's acquisition of one or more than one, but less than all, of the branches of the seller bank and operate the purchased bank as a branch of a holding company subsid-

---

[4] This observation points up another reason why OCGA § 7-1-600 (1) cannot authorize the acquisitions at issue. The agreements between the bank holding company and the sellers of "branch banks" provide for the transfer of real estate, furniture, fixtures and equipment; the acquisition of deposit accounts and assumption of liability for such accounts; and for the prohibition of competition. These do not make up "all or substantially all of the assets of such bank" (OCGA § 7-1-606 (e)), but are only a portion of its assets that the selling bank had devoted to its branch operation. A "branch bank," of course, has no assets, as it is but another operation of the bank itself. Hence, it has nothing to sell. Because only the "bank" is the owner of bank assets, in no manner may it be said that the bank holding company in this case is acquiring "all or substantially all of the assets of such bank[s]."

iary, or whether, as held in the majority opinion, the holding company must acquire the entire banking company in order to obtain approval to operate one of its branches.

1. The majority holding is premised on essentially two grounds:

(A) First, the majority concludes, in essence, that its holding is mandated by an interpretation of OCGA §§ 7-1-602 (e) and 7-1-606 (e) in pari materia. In my opinion, the interplay of these two Code sections neither illuminates nor foreshadows the resolution of the question for decision in this case.

OCGA § 7-1-602 is entitled, "Bank offices and bank facilities." Bank offices and bank facilities are complete and limited banking services, respectively, and by definition they are located in the same county as the parent bank or branch bank. OCGA § 7-1-600 (2), (4).

Subsections (a), (b), (c), and (d) of § 7-1-602 generally require a parent or branch bank to obtain the approval of, and a permit from, the department in order to establish and operate a bank office or facility.

A major focal point of the majority opinion is § 7-1-602 (e). In the event of the merger and consolidation of state banks or trust companies under Part 14 of the Financial Institutions Code — or in the event of conversions, mergers, and consolidations involving a national bank and another bank or trust company under Part 15 — § 7-1-602 (e), in pertinent part, provides that,

> where all of the constituent banks shall have either a parent bank or a branch bank located in the same county, then the surviving or resulting bank shall be the parent bank and may retain and continue to operate any or all places of business of each constituent bank as either a branch bank, a bank office, or a bank facility, as is consistent with and may be authorized by this part.

After the conversions, mergers, or consolidations provided for in Parts 14 and 15 obtain the requisite state and federal regulatory approvals, it would appear to follow as a matter of course that the previously existing parent and branch banks could continue to operate bank offices and facilities within the territory in which the parent and branch banks were located. OCGA § 7-1-602 (e) is thus tied to transactions under Parts 14 and 15, where the constituent banks have a parent or branch bank located in the same county.

In contrast, mergers or other consolidations under OCGA § 7-1-606 (e) constitute an independent exception to Georgia's general prohibition against the establishment of new or additional branch banks. See OCGA § 7-1-601 (c) (1), discussed infra.

OCGA § 7-1-601 (c) (1), (2), and (3) recognize three exceptions to

Georgia's general prohibitions against the establishment of new or additional branch banks. OCGA § 7-1-601 (c) (1) expressly states that the establishment of branch banks pursuant to mergers or other consolidations under OCGA § 7-1-606 (e) constitutes one of these exceptions.

In my opinion, OCGA § 7-1-602 (e) is simply irrelevant to our inquiry in this case.

(B) The second underpinning of the majority opinion is Georgia's historic prohibition against the establishment of new or additional branch banks, beginning primarily with the enactment of state banking laws in 1960. Code Ann. § 13-201 et seq.; Ga. L. 1960, p. 67 et seq. Although the 1960 Act represented the philosophy "that the control of additional banks by large financial interests will ultimately destroy independent banks and result in the domination of the economy by too few persons[,]" *Independent Bankers Assn. v. Dunn*, 230 Ga. 345, 360 (4) (197 SE2d 129) (1973), all banking legislation on this subject since that time has clearly reflected a consistent gradual trend toward the conflicting philosophy "that larger financial interests can offer a wider variety of services and can better provide the capital to meet the needs of borrowers." Id.

In this regard, the 1960 Act prohibited the establishment of any new or additional bank holding companies, as well as a bank holding company's acquisition of voting shares or assets of another bank (with certain exceptions). Code Ann. § 13-207; Ga. L. 1960 at pp. 74-76; see also Ga. L. 1960 at pp. 67-68. In addition, the establishment of any new or additional branch banks was prohibited. Code Ann. § 13-203 (c); Ga. L. 1960 at pp. 71-72; see also Ga. L. 1960 at p. 67.

Under the 1960 Act, a "branch bank" was defined as meaning "any additional place of business of any parent bank not located in the particular city, town or village where its parent bank was chartered." Code Ann. § 13-201.1 (b); Ga. L. 1960 at p. 70. Consequently, it was the intent of the 1960 Act "to keep banking units from expanding into territories beyond their municipal corporate limits." Ga. L. 1960 at p. 68. With the approval of the Superintendent of Banks (now the commissioner), a parent bank or a branch bank was allowed to operate bank offices and facilities within the incorporated limits of the municipal corporation in which the parent or branch bank was situated. Code Ann. § 13-203.1; Ga. L. 1960, p. 72.

In 1970, the term "branch bank" was redefined to mean "any additional principal place of business of any parent bank located in a county other than in the county wherein the parent bank is chartered and is situated." Code Ann. § 13-201.1; Ga. L. 1970, pp. 954-955. Bank offices and bank facilities were likewise redefined to mean an additional place of business of a parent bank or a branch bank located in the same county as the parent bank or branch bank. Code

Ann. § 13-201.1 (c), (d); Ga. L. 1970 at pp. 955-956.

The intent of the 1970 Act was

> to recognize and provide local units of banking with additional service outlets (bank offices and bank facilities) within the entire county in which they are located rather than being restricted to municipal limits as heretofore required in order to meet the requirements of public need and advantage occasioned by urban growth and development outside municipal limits, so that territorial criteria for the establishment of and operation of bank offices and bank facilities shall be the county territorial limit rather than the municipal territorial limit. It is the intention of this Act that no new or additional branch banks will be established except where by reason of changing from municipal limits to county limits there exist bank offices in two counties within the same municipality, i.e., Fulton and DeKalb Counties, by reason of the City of Atlanta being in both counties.

Ga. L. 1970 at pp. 954-955.

In 1973, the legislature recognized an exception to the general prohibition against a company's becoming a bank holding company; this exception applied to corporate reorganizations. Code Ann. § 13-207 (D); Ga. L. 1973, p. 281 et seq.

In enacting the Financial Institutions Code in 1974, the legislature expressed objectives of providing for "appropriate competition among financial institutions," OCGA § 7-1-3 (a) (6), and giving such institutions opportunities to expand their services and facilities so as to be "responsive to the needs and convenience of depositors, borrowers, and other customers and conducive to economic progress." OCGA § 7-1-3 (a) (5).

In 1975, the legislature created an exception to the general branch banking prohibition allowing any parent bank located in a county having a population of 400,000 or more to establish branch banks within any adjacent county having a population of 400,000 or more. Code Ann. § 13-203 (c) (2); Ga. L. 1975, p. 474. This exception is now codified at OCGA § 7-1-601 (c) (2).

In addition, in 1975 the legislature enacted another branch banking exception generally allowing a branch bank to be established through merger, consolidation, or sale of assets in instances in which the commissioner and the appropriate federal regulatory authority determined that one of the parties had become insolvent. Code Ann. § 13-203.1 (f); Ga. L. 1975, p. 473, as amended by Code Ann. § 13-203; Ga. L. 1978, p. 1710 et seq. This exception is now codified at OCGA § 7-1-601 (c) (3).

In 1976, the legislature passed an Act referred to by the parties as the Georgia Bank Holding Company Act. Ga. L. 1976, p. 168. This Act clearly and unequivocally reversed the intent underlying the 1960 Act, by authorizing statewide banking organizations through bank holding companies. The 1976 Act substantially amended Code Ann. § 13-207 and repealed its general prohibition against companies' becoming bank holding companies or acquiring, merging with, or consolidating with other banks. The Act also created Code Ann. § 13-207.1 (now OCGA § 7-1-605), which allows bank holding companies to acquire banks throughout the state, with the approval of the commissioner, subject to the condition that the acquired bank has been in existence and continually operating for five years.

In 1980, the branch banking exception now contained in OCGA § 7-1-606 (e) was enacted as Code Ann. § 13-207.1; and in 1985, OCGA § 7-1-606 (e) was amended to its present form.

Finally, in 1987, the branch banking exception contained in OCGA § 7-1-606 (e) was formally recognized as an independent exception to Georgia's general branch banking prohibition through the enactment of OCGA § 7-1-601 (c) (1).

In construing acts of the legislature on the same subject, the court is to be guided by the latest expression of legislative intention on the particular subject. *Board of Trustees v. Christy*, 246 Ga. 553 (272 SE2d 288) (1980). In view of the foregoing expressions of legislative intention enacted subsequent to the 1960 Act, I do not understand how the resolution of the question for decision in this case can be predicated, as stated in the majority opinion, upon "the expressed legislative intent of the 1960 Act."

2. As amended in 1985, OCGA § 7-1-606 (e) provides:

> *Notwithstanding any other provisions of this part*, a bank holding company which lawfully controls a bank or has received the requisite approvals under this Code section to acquire control of a bank may, with the approval of the commissioner, either at the time such control is obtained or at any time thereafter, merge or consolidate such bank with another of such bank holding company's banking subsidiaries or have another of such bank holding company's banking subsidiaries acquire all or substantially all of the assets of such bank and consequently operate as a branch of such other banking subsidiary.

(Emphasis supplied.)

Parsing this sentence, I find that in chronological order it refers to the following: (a) — the holding company, (b) — the bank over which the holding company has acquired control, (c) — the subsidiary

of the holding company, and (d) — the bank to be operated as a branch of the subsidiary.

Based upon the arrangement of § 7-1-606 (e) and its sentence structure, it is fairly clear to me that in referring to (b) — the bank over which the holding company has acquired control —, and in referring to (d) — the bank to be operated as a branch of the subsidiary —, § 7-1-606 (e) is referring to the same banking entity, i.e., a branch bank; so construed, § 7-1-606 (e) does authorize the commissioner to approve a bank holding company's acquisition of a single branch bank, as well as a parent bank, to be operated as a branch of a holding company subsidiary.

In addition, none of the parties in this case contests the fact that § 7-1-606 (e)'s introductory phrase, "Notwithstanding any other provisions in this part," in essence means, "Notwithstanding Georgia's general prohibition against the establishment of new or additional branch banks." As previously stated, under OCGA § 7-1-601 (c), there are three exceptions to the ban on new or additional branch banks; OCGA § 7-1-606 (c) (1) expressly states that OCGA § 7-1-606 (e) is one of the exceptions.

Consequently, I would hold that under § 7-1-606 (e) a bank holding company may, with the approval of the Commissioner, acquire a branch bank of a federal savings and loan association or a savings bank and operate it as a branch of a subsidiary bank.

3. For basically two reasons, the Court of Appeals concluded otherwise:

(A) First, the Court of Appeals held that since § 7-1-606 (e) requires the holding company to have "control" over the bank to be operated as a branch — and since a holding company has control over a bank under § 7-1-605 (a) (2) when it controls the voting securities, directors or trustees, or management or policies of the entire company — the holding company must control the entire banking company before being authorized to operate one of its branches.

Although it is certainly arguable that the branch-banking exception contained in § 7-1-606 (e) is tied to the acquisition of control over an entire banking company within the meaning of § 7-1-605 (a) (2), in the final analysis I find this argument unpersuasive, because I interpret § 7-1-605 (a) (2) as addressing itself to those circumstances under which a company becomes a bank holding company in the first instance.

(B) Second, the Court of Appeals held that although § 7-1-600 (1) provides that, " '[b]ank' shall include 'bank office,' 'bank facility,' 'parent bank,' and 'branch bank,' unless the context indicates that it does not," the pyramidal structure of Part 18 demonstrates that the term "bank" does not mean "branch bank" within the context of § 7-1-606 (e).

Section 7-1-600 (1) thus establishes a rule creating a presumptive interchangeableness of the terms "bank," "bank office," "bank facility," "parent bank," and "branch bank," in those instances within Part 18 in which only the term "bank" is used. The application of this rule, however, is only the starting point. The ultimate question is whether the legislature actually intended the term "bank" to mean "branch bank" within the context of § 7-1-606 (e). For reasons previously given, I would hold that this was the legislative intent.

The majority opinion holds that the presumptive interchangeableness of terms provided for in OCGA § 7-1-600 (1) is "a vestigial remainder, devoid of substantive content." In my opinion, that assertion is belied by the fact that the legislature has retained this provision within § 7-1-600 (1) from at least 1960 through the latest reenactment of this Code section in 1986. See Ga. L. 1986, p. 458, § 8.

As stated by Chief Justice Bleckley in *Smith, Barry & Co. v. Davis Brothers*, 85 Ga. 625, 631 (11 SE 1024) (1890), although the "linguistic process" employed in statutory enactments may be of "considerable circuity and complexity, . . . all the words of the legislature, however numerous, ought to be preserved, and effect given to the whole, if it can be done." In my opinion, the majority has not "given effect to the whole" in this case.

4. The predecessor of OCGA § 7-1-606 (e) was Code Ann. § 13-207.1 (e), which was enacted in 1980. In pertinent part, it provided:

> Notwithstanding any other provisions of this title, whenever a bank holding company would be eligible under the laws of this state to take action which would cause a bank to become a subsidiary of a bank holding company, it may at its option elect, with the prior approval of the Commissioner of Banking and Finance, to acquire, merge with and/or operate such bank as a branch of another of such holding company's banking subsidiaries without such subsidiary becoming a bank holding company.

In 1981 Op. Atty. Gen. No. 81-74, the Attorney General gave his opinion that Code Ann. § 13-207.1 (e) created at least a limited exception to the branching prohibition of Code Ann. § 13-203 (c), and that a bank holding company could acquire a bank, merge it into a subsidiary of the holding company situated in a different county than the selling bank, and operate the surviving bank with principal offices in the two different counties. The Attorney General further stated that it was his opinion that a cross-county merger under § 13-207.1 (e) was subject to two conditions: first, the commissioner had to give his approval; second, the merger had to take place at the time the bank holding company acquired the bank to be merged into the subsidiary.

In 1985, OCGA § 7-1-606 (e) was enacted in its present form. In our opinion, the 1985 reenactment approved the Attorney General's 1981 opinion and liberalized OCGA § 7-1-606 (e) by allowing the acquired bank to be merged into the holding company's subsidiary "with the approval of the commissioner, either at the time such control is obtained or at any time thereafter. . . ."

5. It can be said that we are presented with an ambiguous statute in this case. I interpret the statute in a manner consistent with the interpretation of the governmental agency charged with the duty of administering the statute. Although not conclusive, it has been held that such interpretations are entitled to great weight. E.g., *Nat. Advertising Co. v. Dept. of Transp.*, 149 Ga. App. 334 (2b) (254 SE2d 571) (1979).

6. Where a bank holding company obtains regulatory approval for the acquisition of a branch bank under OCGA § 7-1-606 (e), the number of competitors in the county wherein the branch bank is located has not changed. The holding company merely steps into the shoes of the seller bank as the parent of the branch. The commissioner possesses ample authority to disapprove the proliferation of branch bank ownership in a given county through a parent bank's attempt to sell branch banks within the same county to different purchasing banks in a piecemeal fashion.

Given the rapid pace of the changes in the structure and ownership of banking entities in this country, as well as the regulatory laws which govern them, it is not unreasonable to presume that the legislature intended to vest the commissioner with some flexibility in his ability to approve or disapprove bank acquisitions in this area. See OCGA § 7-1-3 (a) (7). In my opinion, the majority denies the regulatory agency the flexibility which the statute extends.

As a final matter, the majority's interpretation of § 7-1-606 (e) creates an anomalous and untoward result. In this regard, once a bank holding company has purchased another bank with operations in only one county, merged it into one of its subsidiaries, and begun operating it as a branch, all in accordance with § 7-1-606 (e), the holding company is unable, even with the approval of the Commissioner, to sell the acquired bank to another banking institution unless it is a parent or branch bank within that county.

This result is both anti-competitive and tends to give rise to the very behemoth banking entities which the 1960 Act sought to avoid.

I respectfully dissent. I am authorized to state that Justice Hunt joins in this dissent.

DECIDED JULY 16, 1990 —
RECONSIDERATION DENIED JULY 27, 1990.

*Michael J. Bowers, Attorney General, H. Perry Michael, Executive Assistant Attorney General, Harrison W. Kohler, Deputy Assistant Attorney General, David A. Runnion, Senior Assistant Attorney General, David I. Adelman, Kilpatrick & Cody, Richard R. Cheatham, Susan A. Cahoon,* for appellants.

*Martin, Snow, Grant & Napier, George C. Grant, Edward J. Harrell, Hylton B. Dupree, Jr.,* for appellees.

*John P. Spalding, G. Bland Byrne III,* amici curiae.